## No. 17,232.

CENTENNIAL TURF CLUB, INC. ET AL. *v.* COLORADO RACING COMMISSION ET AL.
(271 P. [2d] 1046)

Decided June 21, 1954.    Rehearing denied July 12, 1954.

Mr. RICHARD H. SIMON, Mr. WILLIAM B. PAYNTER, for plaintiffs in error.

Mr. DUKE W. DUNBAR, Attorney General, Mr. FRANK A. WACHOB, Deputy, Mr. JACK E. KENNEDY, Assistant, for defendants in error.

*En Banc.*

MR. JUSTICE HOLLAND delivered the opinion of the Court.

PURSUANT to a favorable vote of the people on a referred Act submitted to the people in 1948, the legislature in 1949 adopted "An Act Authorizing, Regulating and Providing for Licensing the Racing of Horses and Other Animals with Pari Mutuel Wagering," known as chapter 207, Session Laws of 1949. The provisions of this Act that are involved in the present consideration are section 7 and section 11, which are as follows:

"Section 7. License Fees. For the privilege of conducting racing under a license issued under this Act, the licensee shall pay to the commission, five per cent (5%) of the gross receipts of the pari mutuel wagering at any such race meet. For the purpose of encouraging the breeding, within the State, of valuable thoroughbred race horses, at least one race of each day's meet shall consist exclusively of Colorado bred horses, providing Colorado bred horses are available."

"Section 11. It shall be unlawful to conduct pool selling, bookmaking or to circulate handbooks or to bet or wager on any race meet licensed under the provisions of

this Act, other than by the pari mutuel method, or for any licensee to take more than fifteen per cent (15%) of the gross receipts of any pari mutuel wagering conducted hereunder; it shall be unlawful for any licensee to compute breaks in the pari mutuel system otherwise than at ten cents (10c). If, during any race meet conducted under this law, there shall be underpayments of the amount actually due to the wagerers, the amount of the excess of such underpayments over and above overpayments to wagerers shall, at the expiration of thirty (30) days from the end of said meet, revert and belong to the State of Colorado and be paid to the commission and become a part of its fund, and shall not be retained by the licensee under whose license such race meet was held.

"To secure collection of the income tax due to the State of Colorado on the winnings received by any participant in pari mutuel wagering, there shall be deducted by the operator of any race meet as defined in this Act an amount equal to one per cent (1%) of each winning wager, and the total amount so withheld shall be remitted by the operator of said race meet to the Department of Revenue within ten (10) days after the conclusion of said meet.

"In the event any government or governmental agency imposes a levy on said licensee by a tax on the money so wagered and upon and against its receipts, the said licensee may collect, in addition to the percentage and breaks herein allowed, the amount of the tax so levied. The tax and breaks and license fee herein provided for shall be in lieu of all other licenses and privilege taxes or charges by the State of Colorado or any county, city, town or other municipality or taxing body for the privilege of conducting any race meet provided for herein and licensed by authority hereof."

Prior to the first racing meet, uncertainty in the minds of the Colorado Racing Commissioners arose as to whom the "breaks," as provided for in the statute,

should be paid. That is, whether the money received from the "breaks," as provided in the statute, should be retained by the race track associations or whether they belong to the state. Thereupon the Racing Commission requested an advisory opinion on this question from the Attorney General in 1949. In response to this request, the Attorney General delivered his opinion to the commission which was to the effect that the licensees, or the race track associations, could take no more than 15% of the gross receipts, that the "breaks" accrued to the state and not to the licensees. Upon this opinion the commission adopted the rule requiring all of the "breaks" up to ten cents on the dollar to be paid to the State of Colorado; and the three dog-track licensees and the horse track at Brush, Colorado, paid the breakage to the Colorado Racing Commission under protest. Beginning in 1950 and each year since, the Centennial Turf Club, Inc., plaintiff in error, the horse track licensee at Littleton, Colorado, has paid the breakage under protest. During the racing season of 1951 representatives of the Centennial Turf Club appeared before the commission, and it was agreed that the commission would call a meeting of the representatives of all the tracks after the close of the racing season. This was done, with the result that on October 26, 1951 representatives of the five licensees signed a complaint for declaratory judgment which was filed November 5, 1951 and amended December 12, 1951.

The Attorney General filed an answer admitting the formal allegations of the complaint and denied that it was to the best interests of plaintiffs and defendants that section 11 of the Act be construed and judicially determined; alleging that plaintiffs were not entitled to the relief prayed for; and, finally, praying that the complaint be dismissed. After substitution of parties due to change of state officers on account of election, the case finally was set for trial on May 26, 1953. Before trial, each of the plaintiffs representing dog tracks, stipulated with the Attorney General for dismissal with prejudice.

The remaining parties to the action stipulated at the commencement of the trial that the only issues to be determined were the construction of section 11, supra; a determination as to the rights of the parties to the breakage; and the question of whether or not the breakage that had been paid under protest would be received back from the State Treasurer in the event of a determination favorable to the race track operators was deferred.

Counsel for plaintiff Centennial Turf Club called the Executive Secretary of the Colorado Racing Commission as a witness, one Alfred P. Kelley, Special Assistant Attorney General for the Oregon Racing Commission, and John C. Abbott, Secretary and General Manager of the Oregon Racing Commission, the latter two witnesses testifying as to the interpretation of the Oregon Racing Act — which is almost identical with the Colorado Act—and in connection therewith introduced statistical reports on horse racing in the United States and the American Racing Manual and the laws of twenty-five states, all of which were admitted in evidence. The defendant Colorado Racing Commission called no witnesses, and the matter thus was submitted to the court which found that the "breaks" are overpayments and were included in the 15% of the gross receipts as mentioned in the Act and, further, that the third paragraph of section 11, supra, was inserted by the General Assembly to become effective only upon the happening of a future event, and also determined that the breakage was underpayments and rightfully belonged to the wagerers. On this finding the court entered judgment to the effect that the "breaks" accrued and were payable to the State of Colorado.

In asking for a review of this finding, counsel for the Turf Club contend that each of the above mentioned findings of the trial court was error, and in addition thereto contend that the statute in part is a revenue statute and must be strictly construed against the state; also that the statute is ambiguous and uncertain as to

the beneficiary of the "breaks;" and that the custom and usage shown to the court presented a proper guide to the court for its construction.

There seems to be no dispute between the parties as well as the trial court on the question of ambiguity of the statute on the breakage question, and the trial court so found. We fail to understand, in the face of all the testimony, including that of the Secretary of the Colorado Racing Commission, how the trial court could determine that the "breaks" or "breakage" is an underpayment to the wagerer, when in fact and under the statute there is no relation whatever between the two. All of the testimony is to the effect that underpayments and overpayments to the wagerer result from miscalculation or mistake. There is no mistake involved in the matter of the "breaks" or breakage, because the statute specifically provides for the taking of the odd pennies on payment to the wagerer up to ten cents. In other words, if the calculation on the winning ticket presented by the wagerer shows an amount involving odd cents, the odd cents, up to ten cents, are deducted by the track association from the payment. This is an authorized and legalized withholding of the so-called odd pennies which constitute the breakage, and mistakes in calculation are in nowise involved. It is significant to note that section 11 of the Act, supra, is silent as to the beneficiary of the amount accruing from this breakage, and it equally is significant to note that the legislature made specific provision for the payment of the amount of the underpayments in excess of the overpayments to be paid to and belong to the State of Colorado; were to be computed within thirty days from the end of the racing meet; and paid to the state; and that no part thereof should be retained by the licensee or the track association. It also is significant to note that section 7 of the Act, supra, fixes the license fee for conducting racing as 5% of the gross receipts of the pari mutuel wagering. Under the authority of the Act, the amount of the break-

age, as above mentioned and illustrated, is an undetermined amount collected by the licensee after the pools have been calculated for the winning tickets. At the outset, after all wagers are in and the gross pool thus created, the licensee sets aside 15% and calculations on the winning ticket are made and from this 15% pays to the commission the 5% license fee as provided by section 7, supra. This 5% is paid to the commission daily. Section 11 of the Act, supra, does not provide that the licensee shall retain 10% of the 15% mentioned. It would appear that the intention of the General Assembly was that the licensee should withhold from all of the wagers made and pay to the commission 5% of the gross receipts of all such wagers and pay the same daily to the Commission, and that the licensee may then deduct not more than 15% of the gross receipts. This construction of section 11 of the Act, supra, has support in the third paragraph thereof which is as follows, "In the event any government or governmental agency imposes a levy on said licensee by a tax on the money so wagered and upon and against its receipts, the said licensee may collect, in addition to the percentage and breaks herein allowed, the amount of the tax so levied. * * *" It thus appears contrary to the construction of the Attorney General that the licensee can receive no more than 15% in all events; that in the latter instance on the intervention of any governmental agency in the imposition of a tax on the moneys received by the licensee an amount in addition to the original 15% is provided. If we accept the contention of the Attorney General and the finding of the court that breakage is underpayment, then the rule of the commission following the opinion of the then Attorney General requiring the licensee to pay to the racing commission for the benefit of the State of Colorado on or before noon following each racing day a sum equal to 5% of the total of all mutual wagers and also the breakage is without any authority under the terms of the Act because all that the Act requires is that the

underpayments and overpayments be computed within thirty days from the end of the meet and then be paid to the commission for the benefit of the state.

We do not find a determination of this exact question by any court of last resort of the twenty-five states which legalize pari mutuel wagering on racing. It appears that the State of New Jersey is the only state where its statutes specifically provide that the breakage accrues to the state. This is to be found in chapter 33 of the 1948 laws of the State of New Jersey. Arizona, Delaware, Louisiana, Maine, Nevada, New Mexico, Ohio and West Virginia, according to the statutes introduced in evidence, specifically provide that the breakage is allowed to the licensee. In Arkansas, California, Florida, Illinois, Maryland, Massachusetts, Michigan, New Hampshire, New York and Rhode Island the statutes provide that the breakage be shared in various percentages between the state and the licensee. In Kentucky, Nebraska, Oregon, South Dakota and Washington, like Colorado, the statutes fail to specify to whom the breakage accrues. However, it is shown that in each of these states, according to the universal racing custom as shown by the statistical reports and the American Racing Manual, the licensee collects and retains all the breakage.

In the states where the statutes specifically provide that the breakage goes to the licensee, the total take-out ranges from 10% to 15%, thus it is shown that the licensee is not limited in its take to this initial percentage because the "breaks" or breakage far exceeds the amount the licensee would receive after payment of the state's portion of this initial percentage. In most of the states where the statutes fail to specify whether the breakage accrues to the state or to the licensee, there is the same provision as to the total take. However, those states, according to universal racing custom and usage, allow the breakage to be retained by the licensee.

The statute of the State of Oregon is in many respects

identical with the Colorado statute, and, due to the fact that the Colorado statute is almost word for word the same as the Oregon statute, it would appear that the legislature followed the Oregon statute in preparing the Act. In following the wording and the statutes of the various states, and considering the practical construction of the statutes by the different states, we fail to believe that our legislature ever intended that the 15% of the gross receipts directed to be taken by the licensee included the breakage. It is abundantly clear that twenty-four of the twenty-five states having to do with the problem before us consider the licensee to be entitled either to all of the breakage or at least to a reasonable part thereof; and when we determine that the "breaks" or breakage should go to the licensee, we are not going far afield on this question or contrary to custom established in other states.

Our so-called racing Act as a whole is not a revenue measure, but such portions thereof as provide for the collection of revenue and to be paid into the general fund of the state are revenue measures. The state can obtain revenue only by means of taxation and it is not allowed to obtain revenue by implication. The Act before us is in the nature of an excise tax and if there is an uncertainty or ambiguity contained therein, it must be construed in favor of the taxpayer. We see no reason to believe that the legislature intended the meaning which counsel for the commission contend, because such intention could have been so easily expressed. The legislature took time out to specify and direct to whom the underpayments should be made, that is, to the state, and it could have easily included the breakage if such was its intention. Even if this statute is at all doubtful, the doubt is resolved against such an attempted implication is a tax. We extend the highest respect to the practical interpretation of such an uncertain statute by those administrative officials that are called upon to interpret similar statutes elsewhere and particularly if such prac-

tical construction has been continued for a long period of time and is uniform wherever such a statute has been called into question. This principle is particularly applicable where there is no judicial determination of such statutes to aid us, and we find no reason to believe that the administrative officials elsewhere have misinterpreted the true intent and purpose of similar Acts followed in their respective states. Counsel for defendants in error say there is no ambiguity in the statute, but they present no argument supporting that contention. It also is argued that plaintiff in error, or the track, is quasi trustee of the breakage. This is not true, because there is no beneficiary stated in the statute and certainly it is not trustee for the wagerers because the statute clearly indicates that the breakage does not go to the wagerers, but it authorizes a withholding of the odd pennies therefrom; and finally, it cannot be trustee for the state because the statute does not say that the state is entitled to this breakage. Counsel for defendants in error state that in every instance where the track gets the breakage, or a portion thereof, there is a statute specifically authorizing such taking of the difference. This is an incorrect statement because in the States of Kentucky, Nebraska, Oregon, South Dakota and Washington the tracks receive all of the breakage and the statutes of each of these states do not clearly state whether the licensee or the state received the breakage.

Finally, counsel for defendants in error contend that the breakage is not a tax. If this is true, then Colorado is not entitled to the breakage because otherwise it would be participating in a private business to obtain revenue.

■ Supported by the views herein expressed, we determine that the licensee, or plaintiffs in error, shall collect and retain the breakage, and in accord therewith the judgment of the trial court is reversed.

MR. CHIEF JUSTICE STONE does not participate.