## No. 17,405.

Cloverleaf Kennel Club v. Racing Commission et al.
(277 P. [2d] 226)

Decided November 29, 1954.   Rehearing denied December 20, 1954.

Mr. Max D. Melville, Mr. Fred M. Winner, Mr. Walter F. Scherer, for plaintiff in error.

Mr. DUKE W. DUNBAR, Attorney General, Mr. FRANK A. WACHOB, Deputy, PATRICIA MALOY, Assistant, for defendants in error.

*En Banc.*

MR. JUSTICE HOLLAND delivered the opinion of the Court.

PLAINTIFF in error, to which we will refer as the Club, is a Colorado corporation formed primarily for the ownership and operation of a racing establishment and to conduct racing meets within the state. In the late summer of 1953 it applied to the Racing Commission of the State of Colorado, one of the defendants in error, for a license as is provided in the so-called racing Act, to conduct races in Larimer county. The application was in full compliance with the racing Act and there were no additional requirements made by the Commission.

In November of 1953, what may be called a hearing on this application was held before the Commission. We have nothing before us except a narrative statement as to the proceedings at this hearing. The executive secretary of the Commission, in its presence, stated that the Club had filed all required papers and documents for receiving a license, and that there was nothing else required to be filed; that the files of the Commission contained nothing derogatory to any of the persons interested in the Club as shown by the application; that it was shown that the Club had the absolute right to purchase 160 acres of land that had been selected as a track site; that it was prepared to start construction of the required track and other improvements forthwith; and further, that approximately $255,000 of its capital stock had been subscribed without public solicitation, 98% of the subscribers being Colorado residents, and 90% being residents of northern Colorado. It further was shown that a conservative estimate of the percentage that the

general fund of Colorado would receive from the gross revenue from the operation of the Club would be $300,-000` annually, not including the general, income and excise taxes.

The narrative statement discloses that the Commission had in writing advised the Club that the standard applied by it in the consideration of applications for licenses was the racing Act, particularly sections 5, 6 and 8 thereof, S.L. '49, page 583; and further that it had set up no rule or regulations concerning or creating standards.

The Commission, in denial of the application, directed the following communication to the Club:

"You are advised that on this date the Colorado Racing Commission has considered the application submitted by the Cloverleaf Kennel Club, and in this connection you are advised that:

"The Colorado Racing Commission FINDS that there is presently in existence licenses for the operation of three tracks for the racing of greyhounds totalling 180 days of racing on the Eastern Slope of Colorado, the locations of which are in Derby, Colorado Springs and Pueblo; the Commission further finds that the site of the operation for which license is sought is approximately 45 miles from the location of the presently licensed track in Adams County. It is the further finding of the Commission that the granting of said license at this time would not be in the best interests of racing as a whole nor in the best interests of the people of this State.

"Accordingly, it is advised that said application for license be and the same is hereby denied."

Thereupon the Club petitioned the district court for a peremptory writ directing the Commission to issue it a license for the racing of greyhounds. The writ was issued directing the Commission to certify its record of the hearing held on the application for a license; to show cause why same should not be issued; and to grant the

license forthwith. The Club filed its return. However, there is no transcript of the testimony given before the Commission, and the court allowed the Club to file its narrative statement as to the evidence and occurrences at the hearing, which was supported by affidavits and treated as a supplemental record. No answer was filed to the petition or writ and no denial made by the Commission by answer, evidence, or otherwise, of the matters alleged in the petition, or of the matters set out in the supplemental record, which therefore, in effect, are admitted by the Commission in its motion to quash the writ on the ground, "That the petition herein filed fails to state a claim upon which relief can be granted in that, said petition fails to allege or show that the petitioner herein has no plain, speedy and adequate remedy." On hearing, the court quashed the writ and dismissed the Club's petition by holding in effect that the so-called racing Act gives the Commission a discretionary power in the matter of issuing racing licenses above and beyond the express requirements as set forth in the Act, and since the word "privilege," is used in the Act there is an indication that no inherent right exists to engage in racing and conducting pari mutuel wagering, and the Act merely legalizes what was a prohibited and unlawful undertaking previous to its enactment; that the Commission had the right to consider the number of existing licenses and their locations, and the best interests of racing and of the people of Colorado; and that in refusing to issue the license for which application had been made, the Commission had not acted arbitrarily, capriciously or unlawfully in exercising its discretion.

The Club procured the issuance of a writ of error and seeks a reversal of the judgment on grounds and argument, which, in summation are, that a licensing board has no legal right to deny a license to an applicant fully qualified under the licensing statute here involved, when the statute provides that, the licensing authority "shall" license under such circumstances; that the decision of

the Commission in denying the application on the sole ground that it would not be in the best interest of racing, nor in the best interest of the people of this State, is a declaration of public policy not within the power of the Commission to make, that being a legislative function; that the licensing body can refuse to grant license only upon the grounds which the legislative body permits under the terms of the Act; that the racing Act is unconstitutional in so far as it fails to set forth adequate and uniform standards to govern the Commission in the consideration of applications; and that the decision of the Commission and the trial court's judgment were arbitrary, capricious and constituted an abuse of discretion.

██ On the motion to dismiss or quash the writ, the allegations of the complaint were presumed to be true, and for the purposes of the motion they were confessed by defendants. Such a confession was an admission that the Commission had acted arbitrarily, capriciously and illegally, which stated, among other allegations in the complaint, a claim upon which relief could be granted, and it was therefore error to quash the writ.

██ The second point urged by the Club is that this licensing board or Commission has no legal right to deny a license to an applicant fully qualified under the licensing statute when that statute provides that the board "shall" license under such circumstances.

Section 5 of the Act provides: "The commission shall license, regulate and supervise all race meets held in this State with pari mutuel wagering at which horses or other animals participate, and shall cause the places where such race meets are held to be visited and inspected at least once a year by the commission by its officers or employees, and it shall require all such places to be constructed, maintained and operated in accordance with the laws of this State and the rules of said commission." S.L. '49, p. 583.

The legislature by the employment of the word "shall"

in connection with the issuance of a license, unquestionably intended that such was to be put beyond the pale of permissive action on the part of the Commission in cases where the applicant has met every requirement of the Act in connection with its application, as is here admitted, and does not fall within the specific prohibitions of the Act. The prohibitions specifically contained in the Act are that no license shall be issued for the racing of horses or other animals within forty miles of any other racing operation licensed under this law, and further, that the number and kind of race meets to be held in any one county in any one year shall be determined by the Commission, provided that not more than two race meets for animals other than horses shall be licensed in any county in any one year, nor held for a duration longer than thirty days, and no race meet shall be conducted on any Sunday. The Act provides not only the eligibility for applicants for a license, but distinctly sets out what may be considered ineligible applicants. The use of the word "shall" is a clear indication that in the consideration of applications that meet every requirement when a third person as well as the State of Colorado has an interest in the exercise of the duty of the Commission, that the exercise of the power is then imperative. This rule applies where the statute uses the word "may." *Brooke v. Moore,* 60 Ariz. 551, 142 P. (2d) 211. It seems a wise intendment on the part of the legislature to forestall or prevent the Commission from exercising favoritism among applicants and making it impossible for the Commission to issue licenses only to such applicants as might be in the favor of the Commission, and reject others for no given reason. In the present case, by the Act, the Commission is told what applications to reject. We see no room within the provisions of the Act that allows an arbitrary or capricious action of the Commission. In the matter before us no reasons provided for in the Act are given by the Commission for the rejection of the application here involved. The only reasons as-

signed were that there were presently in existence three tracks totalling 180 days of racing on the eastern slope of Colorado, and that the proposed site for the operation under the pending application is approximately forty-five miles from a licensed track in Adams county, and finally it would not be in the best interest of racing or in the best interest of the people of the state. None of these reasons is sound or within the province of the Commission to make. First of all, it is stated and not denied, that the statement of 180 days of racing is a falsity, and if the Commission can say that an application for license should be rejected because it is forty-five miles from another track when it is provided in the Act, not within forty miles of another track, then there are no bounds to the discretion of the Commission, and it could refuse a license on the basis of fifty, seventy-five or one hundred miles, or any other distance it might see fit to state.

It now sufficiently appears that the Commission assumed powers and exercised discretion clearly beyond the limitations described in the Act. As to the specific matters mentioned in its findings, those are clearly contrary to the wording of the Act itself, and as to the matter of determining that it was not to the best interest of racing or to the public's interest to grant the license applied for, this was definitely beyond the function or authority of the Commission, because the matter of declaration of public policy such as was here undertaken, is a legislative matter, or sometimes to be found in the expression of the people by their vote on certain issues. Regardless of any reference to, or discussion of, the subject of racing being what formerly had been a prohibited and unlawful undertaking, the people by their vote adopted a public policy to the effect that racing such as is here involved within this state is legal. It is not for the Commission to say what is or is not the needs of certain localities, or what is to the interest of racing. So far as the interest of racing is concerned, that is an

economic factor which takes care of itself; and the Act provides the lines of proximity within which the Commission cannot encroach in granting a license. It is our duty to give full respect to the findings of a commission and the discretion exercised if the discretion was exercised on matters it could lawfully consider. It is of no concern to the Commission, as was found by them, that "There is presently in existence licenses for the operation of three tracks * * * on the Eastern Slope of Colorado." So far as the Commission is concerned the Act provides that it is legal to have as many as the forty-mile limit will not prevent, so long as there is not more than one in each county. Primarily, it is evident that the people in legalizing racing did so as a means of obtaining revenue for the general fund and the Commission has no power or authority to interfere with this clearly intended purpose. The matters and things here undertaken by the Commission, as disclosed by their finding in the matter before us, could be given to the Commission by the legislature if it deemed it wise to amend the racing Act.

A pertinent part of section 4 of the Act is as follows: "It shall be the duty of the commission, as soon as possible after its organization, to prepare and promulgate a complete set of rules and regulations to cover the race meets in this State. It shall determine and announce the place, time and duration of race meets, for which license fees shall be exacted * * *." S.L. '49, p. 583.

Counsel for the Commission contend that this is a grant of discretion to the Commission as to the number of licenses. We are not inclined to adopt that view, since, in consideration of the other provisions of the Act, which we have herein discussed, we believe this is a reference to the matter of the racing season and is not, and cannot, be in anywise interpreted as being the power to limit licenses other than is authorized by provisions of the Act. The Commission by the terms of the Act is required to determine the length of time allowed for race

meets, and how many, and what kind are to be held in any one county. It seems that there is a contention that the Commission has the broad discretionary powers which would be a continuing power from year to year. Such is not the case, because, in section 8 of the Act it is provided that after the first year of the operation of a track, and there has been no violations committed by the operator, the Commission shall renew the particular license upon application and grant the same time it had in the preceding year.

When the racing Act was enacted in 1947, after a favorable vote by the people, the legislature surely was aware of its power to delegate to the Commission wide discretion in the matter of its authority to limit the number of licenses. Previous legislatures had given such express power in three instances, namely, the Liquor Code, chapter 89, vol. 3, '35 C.S.A.; the 3.2% Beer Act, chapter 89, vol. 3, section 4(c), '35 C.S.A.; and the Boxing and Wrestling Act, chapter 24, vol. 2, '35 C.S.A. It therefore does not appear reasonable or logical that the legislature intended to grant the Commission the authority to limit licenses or to consider any other matter in connection with applications therefor, other than as set out in the Act. Had it so desired, it could easily have done so in a customary manner followed by previous legislatures. If, as counsel for the Commission now insists, it has the right as a matter of public policy to place limitations on the issuance of licenses, then it would seem that the former legislatures were indulging in a meaningless pastime. The Commission's statement that the refusal was to the best interest of racing and to the public interest is absolutely contrary to the elementary principles of constitutional law, which is to the effect that the propriety, necessity and expedience of legislation is for legislative determination only. It would be a new departure for us to ascertain the public policy of this state from any source other than from our Constitution and our statutes enacted thereunder.

There is a peculiarity in section 6 of the racing Act, which is, in part, as follows: "Every person making application for a license to hold a race meet shall file the same with the commission on or before a day fixed by the commission and shall set forth in such application the time, the place and the number of days such meet shall continue, and such application shall contain such other information as the commission may require. * * *." S.L. '49, p. 583. The last part of the above quotation, namely, "and such application shall contain such other information as the commission may require." is an open door to a nonuniform requirement of applicants for licenses. It can easily be seen that a change in the personnel of the Commission, or even a change in the mind of the Commission as constituted between applications might set up substantially different requirements as between applicants and from time to time, and thereby all possible applicants would be subject to varying requirements. There is no restraint on the Commission as to its interpretation of what may be required and therefore one commission could, in a sense and effect, reverse the actions of another commission. This apparent lack of standards discloses a defect in the Act, such, if it is not constitutional, it is certainly on the borderline. Counsel for the Commission state that in the finding and refusal of the Commission, as is herein fully set out, when the Commission used the expression in the denial of the license, "at this time," that that was evidence of the fact that the Commission was not formulating a policy. We fail to see that the use of these words produces that effect, because such an expression could be used from time to time by the Commission or its successors and be an indefinite postponement of hearings on perfectly valid applications.

Finally, the Commission plainly assumed to exercise a power it did not possess. It denied the application for reasons beyond its right to entertain. It could only reject an application for reasons intended by the statute

as grounds for rejection. Under the guise of "best interest of racing or the public interest," it would have complete control of all future racing within the state according to its own peculiar notions or grounds.

Being unable to find any evidence in the record to justify or support the Commission's action, and finding obvious reasons for reversing the ruling of the trial court in dismissing the petition, the judgment is reversed and the cause remanded with directions to the lower court to reinstate the petition and direct the issuance of a license for which application was made.

MR. JUSTICE ALTER concurs in the result.

MR. CHIEF JUSTICE STONE, MR. JUSTICE MOORE and MR. JUSTICE CLARK dissent.

MR. JUSTICE MOORE dissenting.

As I view the issues involved in this case there are two questions presented, the first of which is: *Under the statute authorizing racing and pari mutuel wagering, does the racing commission have any discretionary power in the matter of considering applications for licenses once it is shown that the applicant has complied with all the express requirements of the racing act?*

In my judgment this question should be answered in the affirmative. The consideration of the entire Act satisfies me that it was the intention of the legislature to grant a discretionary power to the commission in the matter of issuing licenses, beyond the express requirements of the Act. The provision in section 5 of the Act, which reads, "The commission shall license, regulate and supervise all race meets held in this State * * *," when considered in connection with the Act as a whole is not the legal equivalent of stating that the commission *shall* grant the application of all who apply for said license, or all who may meet the express requirements as set forth in the Act.

It is apparent from the Act as a whole that the licensee acquires only a "privilege" to act, which is opposed to the proposition that there is any inherent "right" to engage in the business of racing dogs or horses and conducting pari mutuel wagering thereon. We are not dealing with the operation of a business which is inherently lawful, but, on the contrary, with one which, at least in Colorado, has been historically and inherently a gambling enterprise and legalized only by virtue of the Racing Act. It definitely involves the public morals and general welfare and calls for an exercise of the police power in the public interest. In *Centennial Turf Club v. Colorado Racing Commission,* 129 Colo. 529, 271 P. (2d) 1046, the court said, inter alia, "Our so-called Racing Act as a whole is not a revenue measure, but such portions thereof as provide for the collection of revenue and to be paid into the general fund of the state are revenue measures."

The trial court in this connection correctly stated the situation when it said, " * * * viewed in its most favorable light the act must be considered, as in the New Hampshire case, a combination revenue and police measure * * *." The New Hampshire case to which reference is made is, *North Hampton Racing & Breeding. Ass'n v. New Hampshire Racing Commission,* 94 N. H. 156, 48 A. 2d 472.

In my judgment the Racing Act gave an affirmative grant of authority to the commission to license, to determine the kind, the time and the place of racing meets, and to consider the locations of tracks, and in addition to granting this general authority the Act contained prohibitions pertaining to the power of the commission to act *at all* in specified instances. The interpretation given the Act by the majority opinion is that the prohibitive language in the statute operates as a grant of an absolute right to those applicants who fall outside the area of the prohibitions, and as a mandate to the commission to issue licenses where not specifically forbidden to do so.

With this conclusion I cannot agree. In my judgment the intent of the Act was to tell the commission when it cannot license under any circumstances, but to give discretion to it in the field outside the prohibited area.

The second question presented is: *Did the racing commission, in denying the application of petitioner, act arbitrarily, capriciously or unreasonably in the exercise of its discretionary powers?*

I believe this question should be answered in the negative. It is fundamental that, in determining whether an administrative body has acted arbitrarily, its ruling should not be set aside if the questions are such that reasonable minds might reach opposite conclusions, and it is not the function of this Court to substitute its own judgment for that of the administrative body. In the instant case the commission made three pertinent findings of fact: (1) That on the eastern slope of Colorado there already were three operating race tracks; (2) that the location proposed in the instant application was approximately forty-five miles from an operating track in Adams county; and (3) that the granting of the license would not be in the best interests of racing as a whole, nor in the best interests of the people of the State of Colorado.

I entertain the view that pari mutuel wagering is not a business which is inherently legal and lawful but, on the contrary, is one which is permitted only by virtue of a statute which calls for an exercise of the police power of the state. Any one of the findings above mentioned is sufficient reason for denying the application, and it does not appear from the record in the instant case that there was any abuse of discretion on the part of the commission. In my judgment their action in denying the application should be upheld.

MR. CHIEF JUSTICE STONE and MR. JUSTICE CLARK concur in this dissent.