FOURNET, Chief Justice
(dissenting).
With all due respect to those subscribing to the views herein expressed in the majority opinion, I am constrained to say that I cannot in good conscience join them.
Magnolia Park, Inc., having filed with the Louisiana State Racing Commission its application for a license or permit to conduct a night thoroughbred racing meet “on the flat” [1] for 39 nights beginning September 21, 1956 (through November 17, 1956), and for 42 nights beginning March 19, 1957 (through May 11, 1957), the application being timely filed within the provisions of R.S. 4:152,[2] and in compliance with all of the requirements of Paragraph 4 of R.S. 4:147,[3] the Commission could not arbitrarily and capriciously refuse to issue the permit or license.[4] This is true irregardless whether the refusal was based on the ground that “83 racing days in this area, heretofore allocated to the Fair Grounds Association, *737 is all the local economy can stand,” as stated by Mr. Harry V. Booth, a member of the commission in voting against the granting of a permit to Kenner, or on the ground that the commission did not feel, as expressed by Chairman J. M. Menefee in a statement issued to the press in which those 'favoring Kenner joined,[5] “that any track could prosper from a stockholder’s point of view” [6] as long as it was under the management of Magnolia; consequently, that it was “in the best interests of racing” that Magnolia’s application he denied and Kenner’s granted. I must respectfully point out that these are matters of public policy which, under our constitution, are specifically vested in the legislature and not in any board or commission.
The majority opinion fails to point to any statutory provision which grants this broad power to the racing commission, and it is clear from a mere reading of the provisions themselves[7] that such authority *739 was never in fact delegated to the commission by the legislature and never intended to be so delegated.[8] However, even if it be conceded that such power was delegated to the commission by implication — which is apparently the view taken by the majority although it is not so stated in the opinion- — -then it is obvious these legislative provisions creating the racing commission are unconstitutional, for they leave the matter of deciding to whom a license is to be granted within the realm of the whims and caprices of the majority of the members of the commission. as it happens to be composed at a given time, since the statute lays down no rules, regulations, or standards by which these members are to be guided in reaching such a decision, thus investing them with arbitrary and uncontrolled discretion.that not only deprives the applicants of the equal protection of constitutional provisions, but also amounts to a confiscation of private property. State v. Carter, 159 La. 121, 105 So. 247; State ex rel. Dickson v. Harrison, 161 La. 218, 108 So. 421; Bultman Mortuary Service, Inc., v. City of New Orleans, 174 La. 360, 140 So. 503; City of Baton Rouge v. Shilg, 198 La. 994, 5 So.2d 312; McCauley v. Albert E. Briede & Son, 231 La. 36, 90 So.2d 78, 83, and the authorities therein cited.
Only recently, on June 29, 1956, this court in the last cited case held that Article XXV *741 of the zoning ordinance of the city of New Orleans — which permitted the City Council to grant special permits to certain businesses to locate in districts from which they were otherwise prohibited — was unconstitutional since it failed “to establish a rule or standard to govern the officials charged with its administration, and to operate with uniformity in all cases” the .council being given no “yardstick” to go by, and, consequently, was thus permitted to “approve or disapprove a request for a special permit at its whim.” In its unanimous decision in that case the court stated most emphatically that “To allow the granting or refusal of special permits by officials without any standard- to guide them denies equal protection of the law and is invalid!’ [9] (The emphasis has been supplied by me.)
In the instant case, no standards appear anywhere in the statute; there are no narrowly drawn limitations; there is no circumscribing of this absolute power under the interpretation given by the majority opinion; and there is no substantial interest of the community, or, indeed, of the state, to be served by this arbitrary action. (On the contrary, as will hereafter be shown, this action was not only against the best interest of racing, the statement contained in the press release of Chairman Menefee notwithstanding, but also against the best interests of the state.) The right to equal protection of the laws, and to the protection of private property, which have here been so flagrantly flaunted, rest upon a firmer foundation and transcend the mere whims and/or personal opinions of the members of the racing commission.
Despite the fact that the majority opinion in the instant case brushes aside as unimportant to the issues here raised,[10] the very vital and pertinent holding in Cloverleaf *743 Kennel Club v. Racing Commission of Colorado, 130 Colo. 505, 277 P.2d 226, decided as late as November 29, 1954, is of particular application here and is, for all intents and purposes, “on all fours” with this case.
It is true that in the Cloverleaf case the commission had under consideration only one application (and this is the sole ground given in the majority for refusing to follow the holding or to even discuss it). However, the commission had, theretofore, granted three licenses in the same vicinity, and although Cloverleaf admittedly made application in full compliance with all of the statutory requirements, the commission, in refusing to grant it a permit, gave as reasons the existence of those three tracks for the racing of greyhounds for a total of 180 days, and stated additionally: “It is the further finding of the Commission that the granting of said license at this time would not be in the best interests of racing as a whole nor in best interests of the people of this State.” That it would not be “in the best interest of racing” is the identical reason given in Chairman Menefee’s statement for refusing to grant a permit to Magnolia. Consequently, of particular importance are the reasons given on this phase of the case by the Supreme Court of Colorado in reversing the action of the commission and the ruling of the trial court upholding that action. The court, after pointing out that the only reasons given by the Commission are the existence of the three other tracks, racing for a total-of 180 days, and the “best interest of racing” and the people, states: “None of these reasons is sound or within the province of the Commission to make. * * * as to the matter of determining that it was not to the best interest of racing or to the public’s interest to grant the license applied for, this was definitely beyond the function or authority of the Commission, because the matter of declaration of public policy such as was here undertaken, is a legislative matter, or sometimes to be found in the expression of the people by their vote on certain issues. Regardless of any reference to, or discussion of, the subject of racing being what formerly had been a prohibited and unlawful undertaking, the people by their vote adopted a public policy to the effect that racing such as is here involved within this state is legal. It is not for the Commission to say what is or is not the need of certain localities, or what is to the interest of racing. So far as the interest of racing is concerned, that is an economic factor which takes care of itself; and the Act provides the lines of proximity within which the Commission cannot encroach in granting a license. It is our duty to give full respect to the findings of a commission and the discretion exercised if the discretion was exercised on matters it could lawfully consider. It is of no concern to the Commission * * * that 'There is presently in existence licenses for the operation of three tracks * * *.’ Primal ily, it is *745 evident that the people in legalizing racing did so as a means of obtaining revenue for the general fund and the Commission has no power or authority to interfere with this clearly intended purpose. The matters and things here undertaken by the Commission, as disclosed by their finding in the matter * * *, could be given to the Commission by the legislature if it deemed it wise to amend the racing Act. * * * The Commission’s statement that the refusal was to the best interest of racing and to the public interest is absolutely contrary to the elementary principles of constitutional law, which is to the effect that the propriety, necessity ,and expedience of legislation is for legislative determination only. It would he a new departure for us to ascertain the public policy of this state from any source other than from our Constitution and our statutes enacted thereunder. * * * Finally, the •Commission plainly assumed to exercise a power it did not possess. It denied the application for reasons beyond its right to entertain. It could only reject an application for reasons intended by the statute as grounds for rejection. Under the guise of 'best interest of racing or the public interest,’ it zvould have complete control of all future racing zvithin the state according to its own peculiar notions or grounds.” See, also, State ex rel. Pinellas Kennel Club v. State Racing Comm., 116 Fla. 143, 156 So. 317; State ex rel. West Flagler Amusement Co. v. Rose, 122 Fla. 227, 165 So. 60; State ex rel. Kinsella v. Florida State Racing Comm., 155 Fla. 387, 20 So.2d 258; Brown v. City of Phoenix, 77 Ariz. 368, 272 P.2d 358. (The emphasis has been supplied by me.) 10a
It should he noted that under Louisiana’s racing statute it is provided that an applicant for a permit must not only include in the application the matters as specifically set out in R.S. 4:147(4) (a) through (f), hut also that under (g) it must also furnish “such other information as the commission may require.” The comment of the Supreme Court of Colorado on an identical provision in the Colorado Statute, as set out in the Cloverleaf case, is most appropriate here: “The last part of the above quotation, namely, ‘and such application shall contain such other information as the commission may require,’ is an open door to a non-uniform requirement of applicants for licenses. It can easily be seen that a change in the personnel of the Commission, or even a change in the mind of the Commission as constituted between ap *747 plications might set up substantially different requirements as between applicants and from time to time, and thereby all possible applicants would be subject to varying requirements. There is no restraint on the Commission as to its interpretation of what may be required and therefore one commission could, in a sense and effect, reverse the actions of another commission. This apparent lack of standards discloses a defect in the Act, such, if it is not constitutional, it is certainly on the borderline.”
It is unfortunate that the Louisiana Racing Commission in its supposed zeal for the “best interest of racing” has not only ignored its duty to the people and the “best interest of the state/’ but has, in fact, taken a course of action that is clearly contrary to the “best interest of racing” and can but result in an actual disservice to racing at this time and may well lead eventually to the end of horse racing in Louisiana for all time,[11] for, as will hereafter be shown, it is eminently clear there will be no track meet in Jefferson Parish during the 1956-57 season if this decision is allowed to stand, and, if the statute as interpreted in the majority vests this broad discretion and untrammeled power within the grasp of the commission, then no one will venture to invest the necessarily required large sums to promote this pasttime in Louisiana since these licenses are secured on a year to year basis and the commission thus has it within its power to exercise favoritism among applicants by granting licenses only to those that might be in its good graces in any particular year at the time the applications are granted. This renders the venture too precarious. Next year, what is here happening to Magnolia may well happen to the Fairgrounds corporation if other northern promoters, without funds, without time, and with only a statement of intention to construct a track, are able to win their way into the good graces of the commission members.[12]
There can be no question but that the legislature, in legalizing horse racing, did *749 so as a means of obtaining needed revenue ■for the operation of the state government and its subsidiaries. From figures readily .obtainable, I find that in spite of the disastrous two seasons Magnolia operated its plant as .a harness track (due not to the management but to the fact that harness racing did not prove to be popular with the public in this section), Magnolia yet turned into the state treasurer in the form of taxes, including those levied on the parimutuel wagering, a sum in excess of $200,-000. There is uncontradicted evidence in the record to the effect that if the track is operated “on the flat,” which has proved to be very popular here, then an estimated $498,000 will be realized in pari-mutuel taxes alone during the 1956-57 season, half of which would go into the state treasury and the other half to the parish.
Magnolia, by reason of the fact that it has, through action of the commission that is upheld in the majority opinion, been deprived of a license to operate its existing track during the present season and will, 'therefore, pay not one cent' in taxes. Neither will Kenner. Kenner, to whom the permit has been issued, has no track on which to operate and will not have one on the dates requested, i. e., March 11, 1957, through May 11, 1957, even if at the time it made application it seriously intended to build such a track.[13] In its application Kenner, under specific requirement of law, *751 R.S. 4:147(4), stated the “exact location where it desired to conduct or hold a racing meet.” [14] The Mayor and officials of the City of Kenner’s zoning and planning commission stated most positively to the racing commission no permit would be issued authorizing Kenner to construct this track which, according to maps, lies within the limits of the city.[15] The law further provides, however, that once a license has been granted by the commission in which the exact location required by the applicant is set out, that license "is not transferable nor does it apply to any place, track, or enclosure except the one specified in the license.” R.S. 4:152. (The emphasis has been supplied by me.)
In the face of this positive statutory provision, it is obvious the commission could, under no circumstances, permit Kenner to operate on Magnolia’s track. The statute makes August 15 the deadline for the filing of applications and the attorney general has ruled that an applicant may not, thereafter, amend the application in any respect. The statute also makes September 1 the date on or before which the commission must grant or refuse a license. Even were I to agree with the ruling of the attorney general that an application may not after August 15 be amended, then it is obvious that by the same parity of reasoning the commission could not amend the license it has granted Kenner to permit *753 Kenner to operate under Magnolia’s track under this license after September 1. It is thus obvious that the permit Kenner has secured is a worthless scrap of paper, and that if the majority opinion is permitted to stand neither Kenner, Magnolia, the the state, and certainly not racing, will benefit. The state, which will be deprived of needed revenue, those who make their living by this means, and those who enjoy this sport are the losers, to say nothing of the 9,000 persons who own some 3,327,258 shares of stock and have invested millions in the Magnolia track and are thus deprived of a chance to recoup some of the losses sustained by reason of the unpopularity of the operation of Magnolia’s track for harness racing.[16]
There can be no question but that the commission was alerted to such a result for Mr. Booth, during the first hearing, asked Mr. Ray Benningsen of Chicago, Illinois, vice-president and director of Kenner: “ * * * if we grant you dates and the Parish will not allow you to build and operate it may then be too late to allot dates to Magnolia Park.” Mr. Benningsen thereupon stated he was unfamiliar with the corporation’s negotiations with the parish officials and asked that the incorporating attorney be permitted to address the commission on this phase of the matter. However, the attorney, though testifying, made no reference whatsover to a'permit and the parish officials by appropriate resolutions and letters and telegrams again informed the commission at the August 29 meeting that it would under no consideration permit the construction of Kenner’s proposed track. In the light of these facts it'is obvious that neither Kenner nor the commission has acted in good faith, and it is equally obvious that even if the commission has been granted broad discretion in the matter of granting licenses, that this has been grossly abused. A further study of the asserted grounds on which the application of Magnolia was denied and that of Kenner granted serves but to emphasize the arbitrariness of the commission’s action.
In the press release, in which the other commission members favoring Kenner voted, the Chairman states: “It is the duty of the members of the commission to decide on two most important questions — which applicant is the most capable of conducting a racing meet — both from a management and from a financial standpoint.” It is also stated that “The application of the Kenner Racing Association and the stockholders show that they have conducted-successful racing in Illinois, They have the financial backing to build and conduct a racing plant using private money and not with a public stock selling offering.”
*755 The first of these statements is not only glaring proof of the unconstitutionality of the statute as it is being interpreted by the majority, but is also illusory in substance. The evidence in the record reflects that the second statement is absolutely false.
If in fact the statute places upon the commission the duty of determining which of two or more applicants is in a better position to conduct a race meet from a financial .and management standpoint, then by what standard does it determine what is a sound financial condition and what is sound management? How much money must a concern have in the bank in dollars and cents before it can be considered financially sound? What must be the value of its assets, its deferred credits and charges, its obligations before it can be considered sound financially? Does the fact that a concern has little cash in the bank render it financially unsound when it has assets in the millions on which it can secure credit running into the hundreds of thousands of dollars and that credit has been extended?
Actually the commission did not base its action on either sound management or financial condition (whether sound or unsound) but on the “best interest of racing,” and, as above demonstrated, its action has proved to be detrimental to the “best interest of racing,” and of the state. Neither does the commission or the majority opinion compare the financial and physical condition of the two applicants.
Thus it may be seen that by any and all standards the action taken by the commission was a gross abuse and a wanton disregard of the best interests of racing,' of the state, and of the rights of the individual parties concerned. It is apt to ob-' serve that Kenner did not even apply for the 39 nights'of racing beginning September 21, 1956, and running through November 17, 1956, which Magnolia sought. Consequently, if we were to assume that the commission had a right to elect and select between the applicants, as the majority holds, then there was clearly only one applicant for these dates. The commission does not even make reference to the application, of Magnolia fqr these dates, and it does not give any reason whatever for refusing to grant Magnolia a permit to operate at this time when no one else wanted it.
The record further shows that at the time the application of Magnolia was made' it had already contracted for the track’s conversion to flat racing and that at the ■ time of the trial this work — estimated to cost between $60,000 and $100,000 — had been completed except for certain incidental- items that were dependent upon scheduled deliveries of material that would. arrive well in time for the opening date. Consequently, there could be no possible-reason for not granting Magnolia’s application for these nights.
*757 As for the application for the 42 nights beginning March 19, 1957, and running through May 11, 1957, as previously pointed out in footnote No. 12 and elsewhere, Kenner had no track, no permit from the city and parish officials for the construction of one, and no money with which to build. Besides it would have been a physical impossibility for the track to have been completed in time for the spring meet. Magnolia, on the other hand, had a track that was not only already in existence, but had been converted for the fall dates for flat .racing and would, most certainly, be available for the spring meet.
Much is made of the good financial condition of Kenner and the poor financial condition of Magnolia. The record discloses that Kenner was incorporated on 'August 14, 1956, the day before the deadline for applying for a license; and that the financial statement it submitted to the commission along with its application on the very next day showed a total- asset valuation, including everything, of'only $56,-000,[17] $6,000 reflecting ‘ the capitalization and the remainder being in the form of a so-called paid-in surplus. At the time of •the trial it developed that-$5,000 of this amount had been put on deposit with the commission when application was made and that a check (the amount being unrevealed) had been drawn against the' remaining $1,-000 of the capital account. This left a balance of $50,000. Out of this amount, beginning with September 1, 1956, Kenner was obligated to pay monthly rent in advance on its ground lease .in the sum of $5,000 monthly. It goes without saying that Kenner could not possibly build a track with this amount in assets unless it encumbers itself with debts, or obligations running into the millions since it was stated Kenner proposed to .build a plant costing between $3,000,000 and. $5,000,000. Yet in the commission’s statement is contained the assertion that .Kenner had the “financial backing to build and conduct a racing plant-using private money.” The majority apparently concurs in this statement for it holds it cannot say the commission abused its discretion or erred in this respect. Actually, the record reveals that Kenner not only had no money with which to build a track, hut had absolutely no commitment of any kind from anyone who agreed to 'put ttp a cent of money with which to construct a track or anything else. This is evidenced by the stipulation of Kenner’s own counsel as made during the trial of the- case, which is to the following effect:
“It is stipulated by and between counsel for Magnolia Park, Inc. and Kenner Rac- ■ ing Association, Inc. * * -* that if Mr. *759 James F. Edwards, president and director of Kenner Racing Association, Ray Benningsen, vice-president and director of Kenner Racing Association, Douglas L/Black of New Orleans, Secretary-Treasurer and director of Kenner Racing Association, Marion Kessler and Burt Wilson, both of New Orleans, and directors of Kenner Racing Association, were placed on the witness stand, that they and each of them would testify that in their individual or official capacities as officers of the Kenner Racing Association as on August 15, August 23, and August 29, 1956, they, nor neither of them, had any written commitments to furnish any capital or funds to the Kenner Racing Association, Inc., for the construction of its proposed plant in the city of Kenner, Louisiana, or in connection with any matters relating to the construction of said proposed plant.” (Emphasis supplied by me.)
On the other hand, and although much is made of its bad financial condition, Magnolia not only had a plant in readiness for operation, including the conversion for flat racing, cash in the bank in excess of $38,-000 and other deposits totalling $12,000, prepaid expenses and receivables running close to $50,000, but also a positive commitment in writing from the corporation' that was -to operate the concessions at Magnolia’s track (and which corporation has many times in the past financed race tracks in temporary financial difficulty) of a loan of $250,000, plus a willingness to advance another $250,000 should that be needed.
The majority opinion apparently places much emphasis upon the fact that this commitment was not accompanied by due and appropriate minute and resolution documents of the corporation reflecting that the statement contained in the president’s written letter of commitment was authorized by the corporation. (Strangely enough, the opinion and the commission make no mention of the fact that all Kenner attached to its application in addition to its statement showing it had $56,000 in cash on August 15, 1956, was an affidavit signed by Mr. Edwards, the president of Kenner, to the effect that HE was personally worth about $3,000,000 and had at his disposal for investment in business enterprises another $2,000,000 or so. No proof was required by way of statements to substantiate this self-serving document of Mr. Edwards’ personal worth, and it was actually stipulated, as above pointed out, during the trial that even if Mr. Edwards was worth this amount and could get that much more, neither he nor any one else had ever committed themselves to put up one red cent for the construction of any track for Kenner.) However, the minutes of the commission hearings reflect that the members at no time asked Mr. Kenneth F. McQuaid, who was then present and ready and willing to verify the fact that the corporation in New York was commit *761 ted to the $250,000 loan, any questions with respect thereto. Furthermore, although Mr. McQuaid did state on the trial — which was long after the hearings and could have had no influence on .the commission’s decision to deny Magnolia’s request for a permit — that he was not a director of the corporation in question and had no personal knowledge of any corporate resolution authorizing the advancement of such a loan, he further stated that he was then and had been for some 9 years a member of the legal staff of the corporation and also staff assistant to the president, who had written the letter of commitment; that he had been sent to the hearings and was then prepared to answer any and all questions with reference thereto; and, further, that he was so certain of the authenticity of such a commitment that if he were permitted to leave the room long enough to send a wire to New York the entire $250,000 would be on deposit in the bank to the credit of Magnolia’s account within the hour.
We thus find that in the exercise of its presumed discretion the Louisiana Racing Commission handed a permit to race to a corporation that was clearly a dummy corporation and only 1 day old at the time of application; had no race track, no money to build one, and no commitment of any loan or money for that purpose from any source whatsoever. And it at the same time turned down a corporation that had been m existence for several years, was bona fide and owned by thousand of stockholders in Louisiana, had a track in existence as a going concern into which it had poured millions of dollars and had just spent thousands of dollars in converting to flat racing, with money on hand in the bank to start the season and no creditors pressing, and with a definite commitment of $250,000, which could be used to defray the costs of the conversion and as working capital.
The attitude of the commission in thus making a choice between these two corporations is indeed enlightening. The Chairman admitted on the witness stand that he did not demand as a condition precedent to Magnolia’s application for a license that it have working capital in the bank of $250,000, and that he wasn’t going to permit the commission to be a party tO' Magnolia securing this loan in any event. His exact words are: “Well, to me, the granting of these dates was making us a party to you getting the loan. We did not want to be a party to them having the loan being granted.” Yet he was more than willing to be a party to Kenner— if indeed it could — securing funds running into the millions for the construction of a track that clearly could not and was not to be built, and even though he was aware that Kenner had no definite commitment in this respect. This is reflected by this testimony at the trial: “I was advised that * * * if these racing .dates were *763 granted, that in other words that it would he another corporation formed that would —I mean, additional money would be put up to build the track, and I presume that they would have taken care of this out of the additional money.” (Emphasis supplied by me.)
In the majority opinion it is implied the loan to Magnolia would not have been helpful in any event unless made oh good terms and at low interest rates and the commitment, it is stated, .is silent on th.ese points. However, it was established at the trial that the loan was for a three-year period, extending far beyond the current year, and thus not a current liability; further that it.would indeed be helpful.
It is also implied that the loan would not be forthcoming because it was conditional on 4 things. (It is not mentioned that Kenner was no written commitment and therefore is also silent with respect to any interest rates, etc., even if the money could be obtained, and, further, that Kenner did not even have a promise of a loan — either conditional or otherwise.) Two of these conditions were that Magnolia’s application would be granted. One was that the track be- converted for flat racing, and this was fulfilled at the time of the trial. The last condition dealt with the mere drawing up of proper documents to evidence the indebtedness — a formality without which no loan could be secured in business. (The attitude of the commission with respect to its bad faith in weighing the relative merits of these two corporations is clearly evidenced by the testimony of its Chairman, as above quoted.)
Finally, if any added evidence were needed to reflect the arbitrary and wanton abuse of whatever discretion was vested in the commission, we need only analyze the statement issued by the Chairman, in which all members favoring Kenner concurred, in the light of the foregoing facts, to the effect that “It is in the power of this Commission to grant racing dates to any applicant who convinces the Commission that they have the financial backing and knowledge of how to conduct a race track after they have filed an application according to law.” As above shown, it is obvious that positive evidence could not convince the commission of the financial backing that was unquestionably Magnolia’s whereas the commission needed no evidence and was, in fact, most easily persuaded, that Kenner had unlimited financial backing without a scintilla of evidence to that effect. (Emphasis supplied by me.)
Let us see what the evidence reveals with respect to the management of Magnolia, the other ground on which the commission states it is permitted to pass judgment and did in denying Magnolia’s application and granting Kenner’s.
Kenner has at no time, either in application, at the hearings, or in court, *765 presented to the commission or the court any statement as to who its manager would he if the track were in fact constructed, or as to who any of its employees would be. For all intents 'and purposes it was to have no management just at' it was to have no track. Magnolia, on the other hand, submitted to the commission with its application a complete list of all its employees as proposed, giving the positions they were to hold and a short history of their experience. The only exception was a manager, and it was established that the contract Magnolia had with the one who had previously managed the track as for harness racing had been voided, but that Magnolia was willing to submit to the commission for. its final approval any and all contracts it might .thereafter enter into in its endeavor to secure a good manager. The commission thereupon, through its secretary, sought information from the Thoroughbred Racing Protective Bureau in New York information as to whether these proposed Magnolia employees were “undesirables.” In reply the bureau informed the commission that “the New York files of this Bureau do not contain any derogatory information on the persons listed.”
There is additional evidence in the record to show that Magnolia’s management met with universal approval in racing circles all over the country, including the southern division of the Horsemen’s Benevolent and Protective Association of New Orleans. Additionally, hundreds of reservations had been made for stalls for horses to be entered in the meets. There is not in the record any evidence whatsoever to establish anything derogatory with respect to Magnolia’s management of the track even as a harness track, or that it failed to comply with any rules and regulations whatever, either of the horse associations or of the government. On the contrary, it was clearly established no one had ever criticized the manner in which Magnolia managed its track.
Although by reason of the nature of the case and the analysis of the evidence and law that has been called for this dissent is already long, there is one final point I would like to touch on briefly.
The majority states that inasmuch as there is nothing in the law providing for the manner in which the commission may make rules and regulations, these may be made specifically or by implication; consequently, that when it granted Kenner a permit to race in the flat at night although its Rule No. 22 (K) specifically prohibited such racing at night, then the commission permissibly changed its rules by implication. With all due respect to this holding, I must respectfully dissent here also. I know of no authority sup *767 porting such a statement and none has been cited by the majority. On the contrary, I believe it is a rule of law universally prevailing that no administrative bureau with established rules has the right to change these rules without proper and due • notice to all interested parties. (That is, in fact, the ruling of the attorney general.) In any event, the evidence discloses most positively, as testified to by the commission’s secretary, that it not only has not abrogated this rule No. 22 (k) at the time of the application dead-line and at the time of the trial, but that the commission had no intention whatever of changing this rule until after this litigation is over. Further, inasmuch as applicants are not permitted to amend applications after August 15 under the ruling of the Attorney General, which the commission has chosen to follow, then certainly the commission cannot alter or amend, either specifically or by implication, its rules after the final date on which permits may be granted, i. e., September 1. For this reason, I am in full accord with the holding of the trial judge that inasmuch as the secretary of the commission misled Magnolia and lulled it into a sense of security by assurances that the commission’s rules would be amended to permit night flat racing prior to the dead-line for filing applications, and also prior to the dead-line for granting them, then the commission should not now be permitted to deny Magnolia’s right to race on the flat during the day and to amend its application to conform with the rules as they existed on the said date.
In view of my belief that the racing statute as construed in the majority opinion is unconstitutional, and also in view of these many evidences and facts disclosing the commission’s most arbitrary and wanton abuse of whatever discretion was vested in it, as well as innumerable other instances that I could point out if time permitted, I cannot subscribe to the holding of the majority opinion.

. Magnolia had, for two years previous (1954-55 and 1955-56) operated its plant in Jefferson Parish as a night HARNESS racing meet, and, this proving to lack public support and, consequently, unprofitable, was then in the process of converting the track for racing on the flat. Toward this end it had entered into contracts at the time it filed its application and the work was practically complete at the time this case was tried. The cost of this conversion was estimated as being between $60,000 and $100,000.

. This section provides: “On or before the fifteenth of August of each year any person possessing the qualifications prescribed in this Part may apply to the commission for a license to conduct race meetings.” These licenses are good for the current yearly meet only, and it is significant that in the application the exact location óf the track must be set out. The license, once issued, “is not transferable nor does it apply to any place, track, or enclosure except the one specified in the license.”

. These requirements are that the name of the person or corporation be set out, as well as the corporation’s agents, stockholders, directors, and/or names of members of an association; the exact location where the meet is to be conducted and information as to whether owned or leased; a statement of the assets and liabilities; the kind of racing- to be conducted and the date requested, as well as such information as required.

. The only portion of the act that is “permissive” on the part of the commission is as set out in R.S. 4:149, which clearly has no application to the granting of licenses to operate a meet: “The commission may grant, refuse, suspend, or withdraw licenses to horse owners, *737 joclceys, riders, agents, trainers, grooms, stable foremen, exercise l)oys, veterinarians, valets, and platers, pursuant to any rules and regulations the commission adopts and upon the payment of a license fee as fixed by the commission.” (Italics mine.)

.Significantly, and despite the fact that evidence was introduced at the meeting of August 29, 1956, to show the City of Kenner would not permit the Kenner corporation to build its so-called proposed track, this statement was prepared by Chairman Menefee on the day previous to this meeting. The record discloses the first meeting of the commission, which was open to the public and lasted almost the entire day of August 23, was followed by a two-hour closed executive session at which no decision was reached. A second public hearing was held on August 29, 1956, and it was then that the Police Jury of Jefferson Parish disclosed its vigorous protest to Kenner’s application, and the officials of the City of Kenner, within which city limits Kenner corporation proposed to build a track, stated most emphatically Kenner had never sought permit to build a track and, even if they did seek such a permit, it would not be granted. Additionally, between the first and second meetings the Governor ap- ■ pointed a new member of the commission who was not present on August 23 and was unfamiliar with all of the evidence and testimony then introduced since it was not transcribed but appeared in brief minute form only. Nevertheless, after only a two-hour meeting and an executive session lasting less than 15 minutes, and without handing down any formal or official reasons for refusing the Magnolia license, Chairman Menefee emerged from the executive session and released to the press the statement he admitted was prepared by him on the day previous to the second meeting, or on August 28, before the commission had the benefit of this additional evidence, particularly that disclosing the attitude of the officials of the city and parish with respect to the construction of a track by Kenner.

. This statement is made although Chairman Menefee had just previously stated, and correctly so, that it was not the “duty of this Commission to protect the interest of any speculative investors who have secured stock in any track.” In fact, his statement includes the absurd inference that a corporation should not be formed with an idea of realizing profits, but for the purpose of promoting the best interests of racing only.

. R.S. 4:141-4:161. Although the commission is authorized to make rules and regulations, this authority does not extend to the making of rules governing *739 the granting of licenses, wliieh are covered by the statutory provisions themselves. Instead, this rule-making power is limited’ specifically, to the drafting of regulations covering the ‘‘holding, conducting, and, operating of all race trades, race' meets, and races held in Louisiana, provided such regulations are uniform m their application and effect.” Section 147, entitled “specific duties of commission,” sets forth the commission’s duties as follows: (1) To set the dates on which any i racing meet can operate in any one parish; (2) to designate one of its members to serve with the stewards of the track licensee on each day of the race; (3) to make annual report to the governor covering operations; (4) to require certain information to be contained in applications for licenses; (5) to require oath of the applicant as to the correctness of the information so furnished; and (6) to make rules covering the “holding, conducting, and operating” of race meets. In Cloverleaf Kennel Club v. Racing Commission, 130 Colo. 505, 277 P.2d 226, 229, the . Supreme Court of Colorado interpreted a provision authorizing the commission to prepare and promulgate a complete set of rules and regulations to govern the race meets in that state to have “reference to. the matter of the racing season and is not, and cannot, be in anywise .interpreted as being the power to limit licenses other than is authorized by provisions of the Act.”

. In so far as our statutory provisions reflect, these are the only restrictions on the issuance of licenses to operate race meets: (1) In localities when the people have, by exercise of their option, voted to suppress racing; (2) where a previous license has been granted another track to operate on the same dates within a radius of 100 miles — R.S. 4:147 (1) ; (3) permission to race longer than 90 days in any one .year in any one. parish— R.S. 4:151; (4) on .-Sunday — R.S. 4 :- 151; (5) permission to race at any other location than that specifically set out in the permit-or to transfer the license so granted.- R.S. 4 :152.

. Significantly, the very provision which gives the commission authority to draft rules and regulations for the holding, conducting, and operating of all race tracks, race meets, and races in Louisiana specifically provides that these regulations must be ‘hmiform in their applico tion and effect.” R.S. 4:147 (6). Furthermore, Section 149, which states the commission may grant, refuse, suspend, or withdraw licenses to horse owners, jockeys, etc., further provides that “No license shall be refused to any applicant who is qualified in accordance with the rules and regulations adopted by the commission, and no license shall be revoked without just cause.” (The emphasis has been supplied by me.)

. In the majority opinion it is merely stated: “The relator relies heavily upon the case of Cloverleaf Kennel Club v. Racing Commission, 130 Colo. 505, 277 P.2d 226 but the ruling in that case could not possibly apply to the present situation because as pointed out heretofore the Commission was without power to grant the application to both applicants under R.S. 4:147(1).” No mention is made of the fact that there were NOT two applicants for the dates September 21, 1956, through November 17, 1956, BUT ONLY MAGNOLIA. In fact the majority is not even willing to concede the commission, in refusing to grant a license to Magnolia for these dates, unquestionably abused its discretion, content to state only that this is “moot.”

. The only authorities cited by the majority are eases dealing -with public service, utility, and transportation commissions that are not only specifically created by the constitution and whose rights and powers are there clearly delineated and also in certain statutes, which renders them clearly inapplicable here, but even in these cases, as the law quoted by the majority discloses, the acts of these commissions are subject to review by the courts and may be set aside where there has been an abuse of the discretion thus vested in them.

. It is to be noted that the majority opinion has gone through on the signature of only three members of the court. While there are two concurrences, both of these judges reiterate their view that the statute permitting racing in Louisiana is unconstitutional, and although I formerly signed the decision in Qandolfo v. Louisiana State Racing Commission, 227 La. Jt5, 78 So.2d 504, in vieto of the present interpretation of the statute in the majority, which in my opinion renders it elearly unconstitutional, I will have no other alternative than to join the other two members of the court who already share this vieto.

. The provision reads: “* * * nothing * * * prevents any person from applying to the commission for a permit to conduct races where the racing plant has not yet been constructed.” This does not imply that a mere statement of intention is sufficient. The legislature could have meant nothing else but that the party was in good faith constructing the plant or intended to do so. (Emphasis supplied by me.)

. Tlie Kenner corporation was formed on August 14, 1956, the day previous to the dead-line for applications, with dummy officers consisting of the office force of the incorporating attorney and the entire stock being at the time of the first hearing on August 23, 1956, in that attorney’s name. At this date the corporation had (1) no plans drawn for the track it said it contemplated building and not even an architect; (2) it had no money with which to build as will be hereafter shown, and, so far as the record discloses, at the time of trial it still had no money and no commitment of the loan or gift of any; (3) it had no time within which to build; and (4) it had no permit to build and could secure none. It had no assets, a total capitalization of $6,000, a sum of $50,000 in the form of “termed” paid-in surplus, and a lease on land granted by the same parties that owned the land on which the Magnolia track was constructed,, without any provision in such lease obligating it to build a track. An expert employed by Magnolia disclosed that the land leased by Kenner was barren waste land covered by several feet of humus; that it would have to be entirely reconditioned before heavy equipment could be brought in for construction; and that this work would take until December of 1956. An architect employed by Magnolia testified that a track built to the specifications set out by Kenner before the commission could not possibly be completed prior to June 1, 1957, although Kenner sought racing dates as early as March 11, 1957', and he introduced plans and proposed worksheet to establish such fact.
It is significant that the parties who owned the land on which the Magnolia plant was, constructed, and who leased the land to Kenner were cme and the same, and I am constrained to say that the conclusion is inescapable that, Kenner’s incorporation, its application for these racing dates,, and all of the subsequent manipulations are but a part of a plan that stems from the provision in the Magnolia. lease to the effoet that *751 although this land is under lease to Magnolia for 17 years, beginning in 1955, “Upon the termination * * * for non-payment of rent, or non-payment of taxes, or failure to provide proper insurance, or otherwise violate the terms and conditions of this lease, and Lessee is placed in default, as provided in Paragraph 11 hereafter, all improvements on this property or hereinafter placed hereon, shall ipso facto become the property of the Lessor with no necessity for formal transfer thereof.” The lease further stipulates these improvements consist of the “grandstand, clubhouse, stables and such other buildings and improvements now located on the property” or thereafter constructed. (It is most enlightening to compare these two land leases — particularly in the light of Kenner’s assertion that it proposed to build a track.) This conclusion is fortified by the fact that shortly after the Magnolia lease went into effect in March of 1955, the landowners brought suit to break the lease for failure to observe certain safety precautions although the parish official charged with such inspections stated before the August 23, 1956, hearing that Magnolia had never operated an unsafe place, and this suit was later dismissed by the landowner. The effort to prevent Magnolia from securing these dates may well result in its failure to make yearly rental payment and thus place in the landowners hands all of these track improvements at no cost whatsoever to them.

. This property is described as “That certain piece or portion of ground, situated in the Parish of Jefferson, State of Louisiana, in Section 37 of Township 11, South, Range 9 East, consisting of Section ‘G’ of Chateau Estates, in accordance with the plan thereof by A. T. Dusenberry, C. E., dated February 1929 # * sH »

. The refusal to grant this permit is also upheld by the Police Jury of Jefferson Parish, • the Sheriff, and some 1,209 people in the vicinity who signed a petition opposing Kenner’s application and approving the application of Magnolia.

. Kenner is a closed corporation owned by 5 men having a total issue of 1200 shares of stock and a total capitalization of $6,000.

. Unquestionably Magnolia , would have had many many times this amount on hand had it not expended its millions in tbe construction and maintenance of its track.