No. 18,652.

THE CALIFORNIA COMPANY *v.* STATE OF COLORADO, ET AL.
(348 P. [2d] 382)

Decided December 21, 1959.

Mr. L. M. LAMAR, Mr. V. P. CLINE, Messrs. AKOLT, TURNQUIST, SHEPHERD & DICK, for plaintiff in error.

Mr. DUKE W. DUNBAR, Attorney General, Mr. FRANK E. HICKEY, Deputy, Mr. MAX D. MELVILLE and Mr. FRED M. WINNER, Special Assistants, for defendants in error.

*En Banc.*

MR. JUSTICE FRANTZ delivered the opinion of the Court.

THIS case involves the constitutional validity of Chapter 131, Colo. Sess. Laws 1953 (C.R.S. '53, 138-1-7), popularly called the "severance tax," imposing a graduated tax on gross income "derived from the production or extraction of crude oil, natural gas, or both crude oil

and natural gas from petroleum deposits located within this state * * * " Adjudicated invalidation was sought in the trial court without success. There, as here, the Act was challenged on the ground that it contravened by word, and by deed performed pursuant to the word, certain provisions of both the federal and state constitutions. Direction for an accounting before the trial court is also assailed here.

It is said that the Act: (1) denies The California Company due process and equal protection of the law in violation of federal and state constitutional provisions; (2) does not impose an income tax authorized by Section 17, Article X of the state constitution, but, in fact, is incongruous to said section; (3) brings down with it said Section 17, Article X, if sanctioned by the latter, since both would be offensive to the federal due process and equal protection clauses; (4) imposes a property or ad valorem tax in violation of the uniformity provision of Section 3, Article X, and in violation of the ceiling provision of Section 11, Article X of the state constitution; (5) has a defective title; (6) provides for, and has been construed as, operating retroactively in contravention of Section 11, Article II of the state constitution, and (7) is applied in such manner that it puts an unreasonable burden on interstate commerce, thereby infringing the commerce clause of the federal constitution.

The title of the Act thus impugned is "An Act relating to revenue and taxation, and to amend Chapter 175, Session Laws of Colorado 1937, as amended by all subsequent acts." Said Chapter 175, Sess. Laws Colo. 1937, provided for a graduated income tax. As enacted the 1953 law under present attack added subsection (f) to Section 2 of said Chapter 175, as amended.

Our disposition depends upon the wording, context and interpretation of certain parts of the 1953 Act. Material portions of the assailed Act follow:

"(f) (1). In addition to the tax imposed by subsections (a), (b), (c) and (d) of this section, there shall

be levied, collected and paid for each taxable year ending on and after December 31, 1953, upon that portion of the gross income of every person which is derived from the production or extraction of crude oil, natural gas, or both crude oil and natural gas from petroleum deposits located within this state a tax at the following rates:

| | |
|---|---|
| Under $25,000 | 2% |
| $ 25,000 and under $100,000 | 3% |
| $100,000 and under $300,000 | 4% |
| $300,000 and over | 5% |

"For the purposes of this subsection (f) (1), the words 'gross income derived from the production or extraction of crude oil, natural gas, or both crude oil and natural gas from petroleum deposits located within this state' means the entire amount realized from the sale or other disposition of all crude oil and natural gas produced or extracted during any taxable year from petroleum deposits located within this state.

"(2) There shall be allowed as a credit against the tax computed in accordance with the provisions of paragraph (1) of this subsection (f) an amount equivalent to the sum of all ad valorem taxes levied, assessed and paid during the taxable year upon crude oil, natural gas, oil and gas leaseholds and leasehold interests, and oil and gas royalties and royalty interests for state, county, municipal, school district and special district purposes, except such ad valorem taxes as may be levied, assessed and paid for such purposes upon equipment and facilities used in drilling for, production of, storage of, and pipeline transportation of crude oil and natural gas. * * *

"From and after May 1, 1953, every producer, which term is hereby defined to mean every person producing or extracting crude oil, natural gas, or both crude oil and natural gas from petroleum deposits located within this state, or every first purchaser of crude oil, natural gas, or both crude oil and natural gas produced or ex-

tracted from petroleum deposits located within this state, as the case may be, shall withhold from every royalty payment made to any person claiming or having an interest in any oil or natural gas so produced, except from royalty payments made to the United States of America or the State of Colorado, an amount equal to 3% of such royalty payment, and shall pay to the Department of Revenue, on or before the fifteenth day of October, 1953, the aggregate amount of all such withholdings made during the months of May, June, July, August and September of 1953, and shall on or before the fifteenth day of January, April, July and October in each year thereafter pay to the Department of Revenue the aggregate of all such withholdings made during the three preceding months, and shall upon the dates aforesaid file reports covering such withholdings upon forms to be prescribed by the Director of Revenue; provided, however, that nothing contained herein shall be so construed as to reduce the tax imposed by subsection (f) (1) hereof.

"Every person making a return as required in subsection (f) (3) hereof may take credit for the amount withheld by the producer or the first purchaser against the tax shown to be due upon such return, and any overpayment shown on such return shall be refunded to the taxpayer.

"Section 2. The tax hereby imposed is declared to be a special classified and limited tax in accordance with the provisions of Section 17 of Article X of the constitution of the State of Colorado."

Is the state tax upon such gross income at progressive rates constitutionally valid? In broad outline, this appears to be one of the basic questions which we must resolve. And if such tax is valid, does it so burden interstate commerce in manner and amount that we must annul it? Since proper resolutions of these questions depend in great measure upon the kind of tax with which

we are dealing, it becomes necessary initially to determine the nature of the tax.

That the problem of the nature of the tax has vexed the courts is borne out by the diversity of views appearing in the decisions. "This has been, and still is, a very troublesome problem for the courts; and the conclusions reached are by no means consistent, even with the same court." Constitutional Limitations On Progressive Taxation of Gross Income, by Robert C. Brown, 22 Iowa L. Rev. 246.

Originally the Supreme Court of the United States held that a federal tax on income derived from real property was tantamount to a tax on the property, and therefore, ran afoul of the constitutional provision that direct taxes shall conform to the rule of apportionment. At the same time the decision engendered dubiety as to the nature of a tax on the receipts obtained from personal property. *Pollock v. Farmers Loan & Trust Co.,* 157 U.S. 429, 15 S.Ct. 673, 39 L.Ed. 759. On rehearing it was determined that federal taxation upon income from real and personal property was a direct tax on the property itself. *Pollock v. Farmers Loan & Trust Co.,* 158 U.S. 601, 15 S.Ct. 912, 39 L.Ed. 1108.

Although the effect of these decisions has been overcome by the Sixteenth Amendment, adopted in 1913, which enabled Congress "to levy and collect taxes on incomes, from whatever source derived, without apportionment among the several States, and without regard to any census or enumeration," their impact on the law relating to income taxes has been great indeed.

Following these decisions the federal courts, for some time, and some state courts held income taxes to be property taxes, either on the theory that a tax on income earned from property is a tax on the property itself or that income itself is a form of property and a tax thereon makes it a property tax. Typical cases so holding are *Eliasberg Bros. Merc. Co. v. Grimes,* 204 Ala. 492, 86 So. 56, 11 A.L.R. 300; *Bachrach v. Nelson,* 349 Ill. 579, 182

N.E. 909; *Eaton, C.P. Co. v. Commonwealth,* 237 Mass. 523, 130 N.E. 99; *Opinion of the Justices,* 95 N.H. 537, 64 A. (2d) 320; *Kelley v. Kalodner,* 320 Pa. 180, 181 A. 598; *Power Inc. v. Huntley,* 39 Wash. (2d) 191, 235 P. (2d) 173. Massachusetts and Washington have adhered to this view consistently, Washington because of a constitutional provision.

Other courts have held only that such an exaction is not a tax on property. *Featherstone v. Norman,* 170 Ga. 370, 153 S.E. 58, 70 A.L.R. 449; *Ludlow-Saylor Wire Co. v. Wollbrinck,* 275 Mo. 339, 205 S.W. 196; *State ex rel. Maxwell v. Kent-Coffey Mfg. Co.,* 204 N.C. 365, 168 S.E. 397, 90 A.L.R. 476 (affirmed 291 U.S. 642, 54 S.Ct. 437, 78 L.Ed. 1040); *Welch v. Henry,* 223 Wis. 319, 271 N.W. 68, 109 A.L.R. 508. Perhaps this negative approach — that an income tax is not a property tax — was prompted by the same thought that was imparted by the Supreme Court of Arkansas in the case of *Stanley v. Gates,* 179 Ark. 886, 19 S.W. (2d) 1000:

"* * * and we deliberately adopted the view that it was not a property tax. If it is not a property tax, it does not make any difference what name it is called. Whether it is called an excise tax, or a tax in the nature of an excise tax, or a personal tax, is a mere matter of definition, and does not in any wise change its character."

There is a discernible trend in the evolution of this branch of the law toward embracing the theory that such tax is not an imposition on property. *New York ex rel. Cohn v. Graves,* 300 U.S. 308, 57 S.Ct. 466, 81 L. Ed. 666, 108 A.L.R. 721. "The theory which once won qualified approval, that a tax on income is legally or economically a tax on its source, is no longer tenable." *Graves v. New York,* 306 U.S. 466, 59 S.Ct. 595, 83 L. Ed. 927.

That a tax on income is an excise is a concept which has been gaining momentum. Selected cases so holding are: *Adams Mfg. Co. v. Storen,* 304 U.S. 307, 58 S.Ct. 913, 82 L. Ed. 1365, 117 A.L.R. 429; *Diefendorf v. Gallet,*

51 Ida. 619, 10 P. (2d) 307; *Vilas v. Iowa State Board,* 223 Iowa 604, 273 N.W. 338; *Hattiesburg Grocery Co. v. Robertson,* 126 Miss. 34, 88 So. 4, 25 A.L.R. 748; *In re Opinion of the Justices,* 77 N.H. 611, 93 A. 311; *Benua v. City of Columbus,* 78 Oh. Abs. 152, 152 N.E. (2d) 550. Some courts prefer to describe the exaction as being one in the nature of an excise tax. *Reynolds Metal Co. v. Martin,* 269 Ky. 378, 107 S.W. (2d) 251; *O'Connell v. State Board,* 95 Mont. 91, 25 P. (2d) 114.

At times courts have classified it as a personal tax. *Miles v. Department of Treasury,* 193 N.E. 855, 97 A.L.R. 1474; *In re Opinion of Justices,* 133 Me. 525, 178 A. 621. And there have been times when a tax on income has been treated as sui generis — an income tax. *Marshall v. South Carolina Tax Commission,* 178 S.C. 57, 182 S.E. 96; *Moon Co. v. Wisconsin Tax Commission,* 166 Wis. 287, 163 N.W. 639; *Lawrence v. State Tax Commission,* 286 U.S. 276, 52 S.Ct. 556, 76 L.Ed. 1102, 87 A.L.R. 374.

Next let us consider the nature of a tax on gross income or gross receipts. "Here the charge is measured by gross receipts. This, too, is an occupation or business tax. It has no reference whatever to the amount of property of the company, or its value. It deals with the amount of business done, not with the amount of property owned. Suppose the company should own no property, but continued business with rented property, on which the owner paid the tax; would it not be liable to this tax on gross receipts? If so, clearly it is not a tax upon property, but is a tax upon occupation or business." *Atlanta Nat. Bldg. & Loan Ass'n v. Stewart,* 109 Ga. 80, 35 S.E. 73.

Such a tax "is both an occupation tax and an income tax." *Sims v. Ahrens,* 167 Ark. 557, 271 S.W. 720. The exaction is "in the nature of an excise or license or privilege tax * * *, * * * the measure of the tax being gross receipts." *State ex rel. Batkin v. Welsh,* 61 S.D. 593, 251 N.W. 189. See *Lincoln Traction Co. v. City of Lincoln,* 84 Nebr. 327, 121 N.W. 435.

Federal courts have been at one with state courts in classifying a tax on gross income as an excise. The gross revenue tax ordained by an Oklahoma statute upon coal miners and producers equal to a specified percentage of the gross receipts from the total coal produced, "which shall be in addition to the taxes levied and collected upon an ad valorem basis," was said to be an occupation or business tax and not a property tax. *Choctaw, O. & G. R. Co. v. Harrison,* 235 U.S. 292, 35 S.Ct. 27, 59 L.Ed. 234. And see *Adams Mfg. Co. v. Storen,* supra.

Does the gradient aspect of the tax in question remove it from the excise category and make it a property tax? The Indiana Gross Income Tax Act of 1933 defined "gross income," inter alia, as "the gross receipts of the taxpayer derived from trades, businesses or commerce, and the gross receipts proceeding or accruing from the sale of property, tangible or intangible, real or personal * * *" Section 2 of the Act begins: "There is hereby imposed a tax, measured by the amount of volume of gross income, and in the amount to be determined by the application of rates on such gross income as hereafter provided."

In *Miles v. Department of Treasury,* 209 Ind. 172, 199 N.E. 372, 97 A.L.R. 1474, 101 A.L.R. 1359, the Supreme Court of Indiana adopted the view that such tax was an excise " 'on the recipient of the income, the tax being upon the right or ability to produce, create, receive and enjoy, and not upon specific property.' " In construing the same statute, the Supreme Court of the United States remarked, " * * * the Attorney General says in his brief that it is a privilege tax upon the receipt of gross income. We think this a correct description." *Adams Mfg. Co. v. Storen,* supra. Later, in *Monteith Bros. Co. v. Dept. of Treasury,* 215 Ind. 428, 19 N.E. (2d) 1010, the appellant maintained before the Supreme Court of Indiana that the gross income tax was "an excise or privilege tax," to which that eminent court replied, "This fact is not questioned."

A graduated tax on dividends from which was allowed a single deduction of $750.00 was considered by the Federal Supreme Court in *Welch v. Henry*, 305 U.S. 134, 59 S.Ct. 121, 83 L.Ed. 87. Throughout the opinion the exaction is treated as an income tax, the tax being "on the receipt of income." Because of the one arbitrary allowable deduction it was held to be a net income tax by the state supreme court, *Welch v. Henry*, 223 Wis. 319, 271 N.W. 68, 109 A.L.R. 508, 226 Wis. 595, 277 N.W. 183, and it would appear that this interpretation was tacitly accepted by the Federal Supreme Court in its decision.

Decisions of this court shed some light on the question. For the privilege of conducting racing under the Racing Act of Colorado, the licensee is required to pay to the Colorado Racing Commission a percentage of the gross receipts of the pari-mutuel wagering at any race meet. In a suit involving the disposition of breakage collected in connection with horse racing, this court in the course of its opinion stated that "The Act before us is in the nature of an excise tax * * * " *Centennial Turf Club, Inc. v. Colorado Racing Commission*, 129 Colo. 529, 271 P. (2d) 1046. Both a sales tax and a service tax are excise taxes. *Rinn v. Bedford*, 102 Colo. 475, 84 P. (2d) 827.

The distinction between a property tax and an excise tax is often difficult to come by. Ordinarily they are distinguished by the methods employed in laying them and fixing their amount. "Thus, where the tax is imposed directly by the legislature without assessment, and is measured by the extent a privilege is exercised by the taxpayer without regard to the nature or value of his assets, it is an excise; but if the tax be computed upon a valuation of property and assessed by assessors, although a privilege may be included in the valuation, it is a property tax." *Walker v. Bedford*, 93 Colo. 400, 26 P. (2d) 1051.

Of utmost importance to our discourse is the early ex-

positive opinion rendered in *Denver. v. Tax Research Bureau,* 101 Colo. 140, 71 P. (2d) 809. By constitutional amendment in 1936 (Article X, Section 17) the General Assembly had been authorized "to levy income taxes, either graduated or proportional, for the support of the state, or any political subdivision thereof, or for public schools, and * * *, in the administration of an income tax law, provide for special classified or limited taxation or the exemption of tangible or intangible personal property." The year following the legislature acted under the authority thus bestowed, and the resulting legislation received interpretation in the cited case.

Involved in the suit was the tax exempt status of intangible personal property from ad valorem taxes. As stated by the court, "This act imposed a tax upon net incomes and an additional surtax upon gross income derived from certain specified intangible personal property. Section 39 of the Act provides: 'From and after the effective date of this Act, and notwithstanding any other provision of law, all intangible personal property * * * shall be exempt from ad valorem tax imposed by the State of Colorado, or by any political subdivision thereof; * * * '"

Throughout the entire decision there is a strong ponderable thread of thought, that the imposition of taxes on gross and net incomes is not an ad valorem tax. And throughout the opinion there is a perceptible underlying recognition that exactions on gross and net incomes are the proper subjects of taxation under the constitutional amendment.

This court's awareness in that case of legislation imposing a tax upon net and gross incomes existed by reason of the very controversy confronting it. Said the court: "There is no question that the first taxable year under the new income tax law began on July 1, 1937, and that its provisions imposing taxes on *gross* and *net incomes* are effective from and after that date." (Emphasis supplied.) Again: "An examination of the new

*income tax law* clearly discloses that the purpose of the legislature in its adoption was to substitute the income tax on incomes, *net and gross,* imposed by section 2 for all ad valorem taxation on intangible personal property." (Emphasis supplied.) Finally: "If the position of the city was upheld, the owners of specified intangible property for the last half of the year 1937 would be subject not only to the income tax on the *income, net and gross,* realized from intangible personal property, but also the ad valorem tax upon the property itself." (Emphasis supplied.)

 Actually, there are decisions symptomatic of the view that the popular notion, that there is a distinction between gross income and net income, has no legal or practical significance. Accordingly, it would appear that we here are dealing with an *income* tax. The greater the number of deductions and exemptions allowable the nearer it approaches net income which forms the base of the exaction; the less the number of deductions and exemptions the nearer it becomes gross income which forms the measure for taxation; they are both income taxes and their difference is but a matter of degree. The importance of this observation becomes apparent when it is realized, as any veteran taxpayer knows from experience, that the kind and amount of deductions and exemptions sanctioned by a tax law is a matter of governmental grace.

Here are sanctioning words for the concept taken from *New Colonial Ice Co. v. Helvering,* 292 U.S. 435, 54 S.Ct. 788, 78 L.Ed. 1348:

"The power to tax income * * * is plain and extends to the gross income. Whether and to what extent deductions shall be allowed depends upon legislative grace; and only as there is clear provision therefor can any particular deduction be allowed."

To the same effect is *Helvering v. Independent Life Insurance Co.,* 292 U.S. 371, 54 S.Ct. 758, 78 L.Ed. 1311. "Under the Sixteenth Amendment all income, whether

net or gross, may be taxed by Congress, and the deductions allowed from gross income are given as a matter of grace." *Avery v. Commissioner,* 84 F. (2d) 905.

From the authorities it would appear that both the Federal Supreme Court and this court would consider the tax imposed an excise. Argument of The California Company, that it is a property tax because levied upon gross income on an ascending scale, is not tenable in the light of cited federal decisions and decisions of this court.

▮ It follows that the uniformity of taxation required by Article X, Section 3 of the state constitution does not apply to the excise here under attack, for this "court has consistently held that this constitutional provision refers to the levy of ad valorem taxes upon property and does not apply to taxes imposed upon privileges and occupations." *Jackson v. Glenwood Springs,* 122 Colo. 323, 221 P. (2d) 1083. See *Denver City Railway Co. v. Denver,* 21 Colo. 350, 41 Pac. 826; *American Smelting & Refining Co. v. People,* 34 Colo. 240, 82 Pac. 531; *People v. Denver,* 84 Colo. 576, 272 Pac. 629.

▮ Nor does the Act in question violate Article X, Section 11 of the Colorado constitution. That section provides that "The rate of *taxation on property,* for state purposes, shall never exceed four mills on each dollar of valuation * * * " (Emphasis supplied.) Such section pertains to a property tax, and has no application to an excise tax. *Rinn v. Bedford,* supra.

We conclude, too, that the Act in question is not a perversion of Section 17, Article X of our constitution, the very amendment under which its passage was sought to be justified. There being allowed as a deduction ad valorem taxes described in (f) (2) of the Act, it could with propriety be deemed a net income tax under the above federal citations, particularly *Welch v. Henry,* supra; but above and beyond this, the tax is not inconsonant with Section 17, Article X if we remain consistent and retain the point of view set out in *Denver v. Tax Research Bureau,* supra.

302

Urged by The California Company is the contention that the title of the Act, quoted above, is insufficient to satisfy the requirements of Section 21, Article V of the constitution. It is the mandate of this constitutional provision that:

"No bill * * * shall be passed containing more than one subject, which shall be clearly expressed in its title * * * "

Is there a fatal failure in the title of the Act to adequately apprise one of the subject of the legislation and its nature? Is there something occult or deceptive in the title, "An Act relating to revenue and taxation, and to amend Chapter 175, Session Laws of Colorado 1937, as amended by all subsequent acts"?

■ Considered in its parts, the title has the broad, general, comprehensive subject, "revenue and taxation." Limiting words follow, "and to amend Chapter 175, Session Laws of Colorado 1937, as amended by all subsequent acts." If the act deals with one subject "and the subject is expressed in the title, the constitutional requirement is met. * * * Particularity is not essential, generality is commendable." *Roark v. People,* 79 Colo. 181, 244 Pac. 909.

The amendment suggested in the title pertains to the state income tax law — a law imposing taxes, as we have seen, on gross and net incomes. By the amendment there was added a provision for the income tax now under attack. We believe that the content of the Act comes within the purview of the title, and our conclusion in this respect is borne out by the language used by this court in *Wright v. Muehlberg,* 78 Colo. 461, 242 Pac. 634. As we see it, the following has a particular aptness to the present problem:

"The title of the amendatory act reads, 'An act to amend section 3024 of the Revised Statutes of Colorado of 1908.' The amendment was made by re-enacting the section as a whole and inserting therein the amendatory clause:

" 'Or negligence consisting of a reckless or wilful disregard of the rights or safety of others.'

"This amendment was germane to the section specified in the title, and we have many times held that this provision of the Constitution is to prevent surprise and deception, through legislation pertaining to one subject under a title relating to another. It is inconceivable how surprise, deception, or fraud could be occasioned by a title to a bill *specifically designating a section of an authorized compilation of the laws of a state, of which every person within the borders of the state is bound to take cognizance.* The law is clearly stated in 1 Lewis' Sutherland, Statutory Construction (2d Ed.) 239:

" 'It is held by the great majority of cases that it is sufficient, for the title of an act to amend a Code or revision, to specify the section to be amended, without giving the title of the chapter or division to which it belongs, or in any way indicating the subject-matter of the section. Under such a title any legislation is proper which is germane to the section specified.' "

Measured by the language of these authorities, we hold that the title of the Act is not deficient; that it avoids the evils which the constitutional provision has as its object to prevent.

Next we shall take up the contention of The California Company that the tax under scrutiny transgresses the permissible bounds of the due process and equal protection clauses. In this respect the company leans heavily upon the case of *Stewart Dry Goods Co. v. Lewis,* 294 U.S. 550, 55 S.Ct. 525, 79 L.Ed. 1054 (1934), as vindicating its opposition to the tax. Until the release of the opinion in that case taxation of the character here assailed was considered valid and proper. It was the rationale of previous decisions that the capacity to pay increased generally with an increase in the volume of business, and that classification based thereon was legitimate.

That there was a time when the extent of business

afforded a basis for classification in taxation is verified by selected, illustrative decisions. These decisions shall be briefly considered in chronological order.

Under a formula putting in relation gross receipts and number of miles of railroad to determine average receipts per mile, the Supreme Court sanctioned graduated rates in the case of *Maine v. Grand Trunk Ry. Co.,* 142 U.S. 217, 12 S.Ct. 121, 35 L.Ed. 994 (1891). The case actually turned on the question of burdening interstate commerce.

We consider next the case of *Clark v. Titusville,* 184 U.S. 329, 22 S.Ct. 382, 46 L.Ed. 569 (1902). Its importance requires extensive quotation, particularly of the court's comments on the key case of *Magoun v. Illinois Trust & Sav. Bank,* 170 U.S. 283, 18 S.Ct. 594, 42 L.Ed. 1037. Held proper in that case was a tax laid upon merchants. The rate for each class was on a progressive scale depending upon the amount of gross sales. To the charge that the tax violated the equal protection clause the court said:

"Classification by amount came up for consideration and decision in *Magoun v. Illinois Trust & Savings Bank,* 170 U.S. 283, and was sustained. That case, plaintiff in error recognizes, may be urged against his contention and attempts to limit its decision to the power of a State over inheritances, and to explain by that power not only the taxes imposed, but the discriminations which were claimed to have resulted from grading the taxes by the amount of the legacy. * * *

"The law of Illinois was charged with inequality of operation because of the classes which it created. It was asserted, as it is in the case at bar, that the classes were formed upon arbitrary differences, and the provisions of the statute which fixed the tax upon legacies to strangers to the blood of the intestate were vigorously assailed. Those provisions were as follows:

" 'On each and every hundred dollars of the clear market value of all property and at the same rate for

any less amount on all estates of ten thousand dollars and less, three dollars; on all estates over ten thousand dollars and not exceeding twenty thousand dollars, four dollars; on all estates over twenty thousand dollars and not exceeding fifty thousand dollars, five dollars; and on all estates over fifty thousand dollars, six dollars. Provided, that an estate in the above case, which may be valued at a less sum than five hundred dollars, shall not be subject to any duty or tax.'

"Manifestly, there was inequality between the members of different classes, and that was conceded in the opinion, but as manifestly there was equality between the members of each class, and that equality was held to satisfy the Fourteenth Amendment of the Constitution of the United States; and the reasoning by which that conclusion was supported is applicable to the case at bar. We met the contention accurately and squarely that there was no reasonable distinction between the classes. We said:

" 'If there is inequality it must be because the members of a class are arbitrarily made such and burdened as such, upon no distinctions justifying it. This is claimed. It is said that the tax is not in proportion to the amount but varies with the amounts arbitrarily fixed, and hence that an inheritance of $10,000 or less pays 3 per cent, and that one over $10,000 pays not 3 per cent on $10,000 and an increased percentage on the excess over $10,000, but an increased percentage on the $10,000 as well as on the excess, and it is said, as we have seen, that in consequence one who is given a legacy of $10,000 and one dollar by the deduction of the tax receives $99.04 less than one who is given a legacy of $10,000. But neither case can be said to be contrary to the rule of equality of the Fourteenth Amendment. That rule does not require, as we have seen, exact equality of taxation. It only requires that the law imposing it shall operate on all alike under the same circumstances. The tax is not on money, it is on the right to inherit, and

hence a condition of inheritance, and it may be graded according to the value of that inheritance. The condition is not arbitrary because it is determined by that value; it is not unequal in operation because it does not levy the same percentage on every dollar; does not fail to treat "all alike under like circumstances and conditions, both in the privilege conferred and the liabilities imposed." The jurisdiction of courts is fixed by amounts. The right of appeal is. As was said at bar, the Congress of the United States has classified the right of suitors to come into the United States courts by amounts. Regarding these alone, there is the same inequality that is urged against classification of the Illinois law. All license laws and all specific taxes have in them an element of inequality; nevertheless they are universally imposed, and their illegality [sic] has never been questioned.' "

In *Metropolis Theatre Company v. Chicago,* 228 U.S. 61, 33 S.Ct. 441, 57 L.Ed. 730 (1913), the Supreme Court inquired into the validity of an ordinance which provided for license fees graded according to the price of admission charged spectators of entertainment. It was determined that equal protection was not denied by such an exaction. The classification was upheld as not being arbitrary or unreasonable, even though some of the theaters charging the higher admission could show less gross revenue than those charging a smaller sum for admission and accordingly paid lower license fees.

An additional tax setting up a scandent scale according to the number of cases of fish products packed was said not to thwart the Federal 14th Amendment. "The inequalities of the tax are based upon intelligible grounds of policy and cannot be said to deny the petitioner its constitutional rights." *Pacific American Fisheries v. Alaska,* 269 U.S. 269, 46 S.Ct. 110, 70 L.Ed. 270 (1925).

A chain store tax establishing rates in increasing progression with the number of stores under the same general management, supervision or ownership was held

not repugnant to the equal protection clause in the celebrated case of *State Board of Tax Commissioners v. Jackson,* 283 U.S. 527, 51 S.Ct. 540, 75 L.Ed. 1248, 73 A.L.R. 1464 (1931).

*Stewart Dry Goods Co. v. Lewis,* 294 U.S. 550, 55 S.Ct. 525, 79 L.Ed. 1054 (1934), was hailed as the herald of a new day in the field of state taxation. The Supreme Court held invalid a Kentucky statute imposing a graduated tax measured by the amount of gross sales. It was the opinion of the majority of the court that it could not be justified as an excise on the privilege of merchandising, because there was no reasonable relation between the amount of the tax and the value of the privilege, and no reasonable relation between gross sales and net profits as would justify the classification.

Denunciation of the Act was unequivocal:

" * * * The act does not impose an income or profits tax, or a license tax, is not an inspection measure, or a police regulation. The tax is not confined to a particular method of merchandising. All retailers, individual and corporate, selling every description of commodities, in whatever form their enterprises are conducted, make up the taxable class. And the excise is laid in respect of the same activity of each of them — the making of a sale. Although no difference is suggested, so far as concerns the transaction which is the occasion of the tax, between the taxpayer's first sale of the year and his thousandth, different rates may apply to them. The statute operates to take as the tax a percentage of each dollar due or paid upon every sale, but increases the percentage if the sale which is the occasion of the tax succeeds the consummation of other sales of a specified aggregate amount. As found by the court below, the act of making a sale, which with all others made in the taxable year represents a total sales price of $400,000 or less, results in the imposition of a tax of 1/20th of one per cent. upon the price, whereas the making of the same sale by one who has theretofore sold $400,000 but less than $500,000

worth of goods entails a tax of 2/20ths of one per cent., or by one whose prior sales aggregate $900,000, a tax of 17/20ths of one per cent. * * *

"Thus understood, the operation of the statute is unjustifiably unequal, whimsical and arbitrary, as much so as would be a tax on tangible personal property, say cattle, stepped up in rate on each additional animal owned by the taxpayer, or a tax on land similarly graduated according to the number of parcels owned."

In the course of the opinion the majority sought to distinguish the case of *Clark v. Titusville,* supra, to show that the law therein was not controlling of the case then before it. Then in 1936 the challenge to the Iowa chain store tax was resolved upon the authority of *Stewart Dry Goods Co. v. Lewis,* supra. Taxes were imposed upon stores both on the basis of the number of stores and on the gross receipts taken in by them. Both of the exactions were based upon graduated formulae. *Valentine v. Great Atlantic & Pac. Tea Co.,* 299 U.S. 32, 57 S.Ct. 56, 81 L.Ed. 22 (1936), the gross receipts phase of the statute was struck down.

These two decisions provoked a profusion of text-writing dissent. With unanimity authors of law review articles agreed with the dissenters in the Stewart case, and a number of them believed there was no basis for reconciliation between *Clark v. Titusville,* supra, and *Stewart Dry Goods Co. v. Lewis,* supra. 35 Columbia Law Rev. 606; 48 Harvard Law Rev. 1434; 21 Iowa Law Rev. 93; "Constitutional Limitations on Progressive Taxation of Gross Income," by Robert C. Brown, 22 Iowa Law Rev. 246; 33 Mich. Law Rev. 1278; 20 Minn. Law Rev. 88; 9 So. Calif. Law Rev. 167 are typical of the critical views expressed by authors of articles on *Stewart Dry Goods Co. v. Lewis.*

Decisions of the Federal Supreme Court following the Stewart and Valentine cases have rendered opaque that which could have been considered crystal clear by the pronouncements of those two cases. Justice Roberts, the

author of the Stewart majority opinion, wrote the opinion of the majority in *Great Atlantic & Pac. Tea Company v. Grosjean,* 301 U.S. 412, 57 S.Ct. 772, 81 L.Ed. 1193, 112 A.L.R. 293 (May 1937). He rejected the argument of the dissenters, based in great part on the philosophy of the Stewart decision.

Involved in the Grosjean case was a state statute which imposed a chain store tax graduated according to a formula classifying stores as to numbers under the same general management or ownership, whether operated in the "state or not." It was decided that equal protection was not impinged, the court rejecting the argument "that in adjusting the rate for a chain store in Louisiana the legislature may not take into account the size of the chain to which the store belongs, by counting the total number of its units wherever located. So to do, it is claimed, is arbitrarily to discriminate against sectional or national chains in favor of intrastate chains."

Later in the year 1937 in *Rapid Transit Corp. v. New York,* 303 U.S. 573, 58 S.Ct. 721, 82 L.Ed. 1024, the court held the Stewart case to be inapplicable to a flat gross income tax, and in the course of the opinion sought to show the limited application of the opinion in that case. At the same time it seemed to resuscitate the doctrine of *Clark v. Titusville,* saying approvingly that "we rejected an equal protection objection to a license tax on merchants, which we said was 'a tax on the privilege of doing business regulated by the amount of sales, and * * * not repugnant to the Constitution of the United States.' And we have heretofore had occasion to remark that gross receipts from an occupation constitute an 'appropriate measure of the privilege' of engaging in that occupation."

Adding to the difficulty of the problem is the case of *Welch v. Henry,* supra (1938). A graduated tax on gross income less an arbitrary deduction of $750.00 was sanctioned by the Supreme Court. Not mentioned by the court, but urged by the appellant as invalidating the tax

statute, is the case of *Stewart Dry Goods Co. v. Lewis,*
supra. Language in the opinion strongly suggests that
the Supreme Court considered the imposition a net in-
come tax, probably because of the provision for the one
deduction.

Are decisions subsequent to the Stewart case, and a
few state decisions hereinafter discussed straws in the
wind? Are there indications that the Stewart minority
opinion would be adopted if the Federal Supreme Court
could entertain anew the question? The State of Colo-
rado in the instant case assiduously advocates the likeli-
hood of a change of philosophy by reason of the evolu-
tion of the law and the difference in cast composing the
highest court of the land at this time.

The City of Paducah, Kentucky, enacted an ordinance
in 1947, imposing a tax in an ascending scale based upon
the volume of gross receipts of the trade or occupation.
Validity of the tax was tested in *Paducah Automotive
Trades Ass'n v. City of Paducah,* 307 Ky. 524, 211 S.W.
(2d) 660 (1948), partly upon the authority of *Stewart
Dry Goods Co. v. Lewis.* In the course of the opinion
the Supreme Court of Kentucky vouchsafed that if the
former Kentucky statute were submitted later than it
was or to the then present Supreme Court, its decision
would have validated the tax. The Kentucky court held
that the minority opinion in the Stewart case stated the
correct law. It concluded that the ordinance was valid.

As late as 1956, in the case of *Mississippi v. Para-
mount-Gulf Theatres,* 226 Miss. 404, 84 So. (2d) 403, the
impact of *Stewart Dry Goods Co. v. Lewis,* supra, was
blunted. "The statute in question places a two percent
tax on each dollar of gross revenue derived from the
sale of admission to any picture show operating in the
State. It then classifies operators of more than ten pic-
ture shows belonging to a single chain or group into a
separate class and levies on such chain operators an ad-
ditional three percent tax on each dollar of gross revenue
derived from the sale of admissions to any such moving

picture show 'belonging to a chain or group having a total of more than ten (10) such moving picture shows wherever situated so that the total tax on such moving picture shows belonging to such chain or group shall be five (5%) on each dollar of gross revenue so derived. * * * ' "

The Supreme Court of Mississippi refused to apply the Stewart doctrine — in fact, held that it was distinguishable from the controversy before it.

Colorado has an analogue in *Jackson v. Glenwood Springs*, 122 Colo. 323, 221 P. (2d) 1083, in which this court upheld an ordinance providing for a graduated tax using as the basis of progression the number of employees in each establishment. In repudiating the contentions that the ordinance violated the equal protection clause, that it was arbitrary and capricious in the classifications formulated, this court resorted to *Clark v. Titusville,* supra, as supporting authority.

█ For this court to declare the act violative of federal equal protection, it must be convinced beyond a reasonable doubt that the Act does so violate. *Mosko v. Dunbar,* 135 Colo. 172, 309 P. (2d) 581. And where the Supreme Court of the United States has spoken on the subject, we have no choice but to heed and obey its words. *Mosko v. Dunbar,* supra; *Pueblo Building and Const. Trades Council v. Harper Const. Co.,* 134 Colo. 469, 307 P. (2d) 468. There are intimations in the federal decisions that a tax such as this does not offend the Fourteenth Amendment.

By C.R.S. '53, 138-1-7 (5) (Ch. 131, Sec. 2, Colo. Sess. Laws 1953, supra), the tax is denominated "to be a special classified and limited tax * * * " Be it remembered that it was said that "All license laws and *specific taxes* have an element of inequality; nevertheless they are universally imposed, and their illegality [sic] has never been questioned." *Clark v. Titusville,* supra. (Emphasis supplied.)

█ The tax is imposed "upon that portion of the

gross income of every person which is derived from the production or extraction of crude oil, natural gas, or both crude oil and natural gas from petroleum deposits located within this state" at progressive rates. C.R.S. '53, 138-1-7. Such a tax is an excise upon the privilege of producing or extracting within the state, measured by the amount of sales. *American Mfg. Co. v. St. Louis,* 250 U.S. 459, 39 S.Ct. 522, 63 L.Ed. 1084; *Oliver Iron Min. Co. v. Lord,* 262 U.S. 172, 43 S.Ct. 526, 67 L.Ed. 929.

It might be said to come within the differentiating expression indicating other disposition of *Stewart Dry Goods Co. v. Lewis,* supra, had the factor been present, i.e., "The tax is not confined to a particular method of merchandising." Again, it was suggested in the Stewart opinion that if one type of operation made up "the taxable class," validity might attend.

Finally, should the credits allowed by the Act to be applied against the gross income constitute the instant tax a net income tax within the decisions of *Welch v. Henry,* supra, we have another reason for not declaring the Act incompatible with the equal protection clause.

Considerable stress has been laid on the purport and the effect of the tax as burdening interstate commerce. In its brief The California Company advocates that "As applied to the proceeds realized by plaintiff from the greater portion of its oil production in 1953, the imposition of the tax on such proceeds or income constitutes an unreasonable burden upon interstate commerce in violation of the interstate commerce provisions of Section 8, Article 1, of the Constitution of the United States."

"It would be a Herculean, if not impossible task, to review and harmonize the myriad decisions of the Supreme Court of the United States on the subject of interstate commerce and exactly what incidents thereof may be constitutionally taxed by the States." *Roy Stone Transfer Corp. v. Messner,* 377 Pa. 234, 103 A. (2d) 700. Justice Clark in the very recent case of *Portland Ce-*

*ment Co. v. Minnesota,* 358 U.S. 450, 79 S.Ct. 357, 3 L.Ed. (2d) 421, 67 A.L.R. (2d) 1292, noted that the Federal Supreme Court "alone has handed down some three hundred full-dress opinions * * * "

Justice Clark was not given to understatement when he said in the same case:

"That there is a 'need for clearing up the tangled underbrush of past cases' with reference to the taxing power of the States is a concomitant to the negative approach resulting from a case-by-case resolution of 'the extremely limited restrictions that the Constitution places upon the states * * * ' * * * Commerce between the States having grown up like Topsy, the Congress meanwhile not having undertaken to regulate taxation of it, and the States having understandably persisted in their efforts to get some return for the substantial benefits they have afforded it, there is little wonder that there has been no end of cases testing out state tax levies. The resulting judicial application of constitutional principles to specific state statutes *leaves much room for controversy* and confusion and little in the way of precise guides to the States in the exercise of their indispensable power of taxation." (Emphasis supplied.)

Adverting to the instant case, the trial court found "no evidence * * * showing that the tax constitutes an unreasonable burden on commerce as a factual matter." In its findings the trial court further recited:

"The production and marketing procedure is substantially as follows:

"Oil and gas reach the surface (referred to in the testimony as the 'well head') as a homogeneous mass; and, of physical necessity, if oil is brought to the surface, gas is mixed with it. (However, as will be mentioned in more detail later herein, as the rate of production of oil increases, the rate of production of gas increases in more rapid progression.)

"After the admixed oil and gas reach the well head, the mixture flows by pipe (owned by the California

Company) to a 'separator.' The separator processes the mixture to remove most of the gas from the oil. The oil then flows by pipe (owned by the California Company) to a 'heater-treater' where the remainder of the gas is removed from the oil. From the heater-treater, the oil is transported by pipe (owned by the California Company) to 'lease tanks' (owned by the California Company) in which the oil is temporarily stored and is gauged or measured. To this point, the oil has not left the lease site or its immediate vicinity, and it is the sole property of the producer — the California Company.

"The lease tanks are connected to an interstate pipeline operated as a common carrier, and, at the instant the oil leaves the lease tanks, it starts its journey in interstate commerce. The California Company does not own and it has no interest in the interstate pipeline. To the contrary, that pipeline is owned and operated by a separate corporation.

"The California Company retains title to and retains all of the increments of ownership of the oil up to the point in the production process that the oil leaves the lease tanks, but, by contract, title and all increments of ownership pass to a purchaser at the instant the oil leaves the lease tanks and enters the interstate pipeline. The California Company itself sends no oil owned by it through the pipeline. Instead, all of the oil it produces in the State of California is sold to other corporations — that is, to Standard Oil Company of California, Western States Refining Company and Uinta Oil Refining Company, all of which are corporations entirely separate and distinct from plaintiff and entirely separate and distinct from the pipeline company — and these sales are fully consummated when the oil leaves the lease tanks. At that instant, the purchaser's firm obligation to pay for the oil comes into being, and all risk of loss is on the purchaser.

"The evidence shows that although the California Company is part of the corporate chain of Standard Oil

Company of California, the California Company is a separate corporation; and, at least as to all oil it produces in Colorado, the company acts only as a producer and not as a marketing company. The total interest of the California Company in all oil it produces in Colorado ceases, after the oil has been produced and twice processed by the company, but long before the oil leaves the State of Colorado."

It thus appears that The California Company extracts a natural resource from the earthy depths of Colorado, processes the material here, and delivers the product from its tanks into a pipe line located in Colorado where the product starts its interstate journey. The delivery into the pipe line is pursuant to contract between The California Company and Standard Oil Company:

"Crude oil sold under this agreement shall be delivered for Buyer's account to the pipe lines connected to Seller's lease and fee storage tanks in the Rangely Field for interstate shipment. Title to crude oil thus delivered shall pass to Buyer when the oil passes the outlet valves of such storage tanks."

We remind ourselves that the exaction is on "the gross income of every person which is derived from the production or extraction of crude oil, natural gas, or both crude oil and natural gas from petroleum deposits located within this state * * * " The tax is not on sales; and there is no tax unless there is a severance of the natural resource from the soil. The incidence of the tax is not on the sale of the processed material; it is on gross receipts derived from the withdrawal of raw materials from the soil of Colorado.

A tax on the value of ore mined or produced was attacked as a property tax burdening interstate commerce in *Oliver Iron Co. v. Lord,* supra. The court observed: "Obviously a tax laid on those who are engaged in that business, and laid on them solely because they are so engaged, as is the case here, is an occupation tax. It does

not differ materially from a tax on those who engage in manufacturing."

There is a parallel factually between the cited case and the case presently being considered. Note:

"The facts on which the contention rests are as follows: The demand or market within the State for iron ore covers only a negligible percentage of what is mined by the plaintiffs. Practically all of their output is mined to fill existing contracts with consumers outside the State and passes at once into the channels of interstate commerce. Three-fourths of it is from open pit mines and one-fourth from underground mines. At the open pit mines empty cars are run from adjacent railroad yards into the mines and there loaded. Steam shovels sever the ore from its natural bed and lift it directly into the cars. When loaded the cars are promptly returned to the railroad yards, where they are put into trains which start the ore on its interstate journey. The several steps follow in such succession that there is practical continuity of movement from the time the ore is severed from its natural bed. The operations within the mine and the movement of the cars into and out of the mine are conducted by the plaintiffs. The subsequent transportation is by public carriers. At the underground mines the plaintiffs dig the ore, bring it to the surface through shafts and put it in elevated pockets where it readily can be loaded into cars. The subsequent movements are much the same as at the open pit mines, but their continuity is not so pronounced. Some of the ore from both kinds of mines — between 10 and 20 per cent. — is concentrated by washing or beneficiated after coming out of the mine and before starting out of the State, but our conclusion respecting the usual operations renders this deflection immaterial.

"Plainly the facts do not support the contention. Mining is not interstate commerce, but, like manufacturing, is a local business subject to local regulation and taxation. * * *"

If the extraction of oil and gas may be likened to manufacturing, as suggested in the Oliver Iron Co. case, then *American Mfg. Co. v. St. Louis*, supra, is helpful in resolving our problem. St. Louis enacted an ordinance requiring every manufacturer to take out a license and to pay a tax of a certain amount on the aggregate amount of sales made by him during the year. "The tax," said the court, "is computed according to the amount of the sales of such manufactured goods, irrespective of whether they be sold within or without the State, in one kind of commerce or another; and payment of the tax is not made a condition of selling goods in interstate or in other commerce, but only of continuing the manufacture of goods in the City of St. Louis."

Of particular pertinence is the following language of the court:

" * * * In the outcome the tax is the same in amount as if it were measured by the sale value of the goods but imposed upon the completion of their manufacture. The difference is that, for reasons of practical benefit to the taxpayer, the city has postponed payment until convenient means have been furnished through the marketing of the goods.

"In our opinion, the operation and effect of the taxing ordinance are to impose a legitimate burden upon the business of carrying on the manufacture of goods in the city; it produces no direct burden on commerce in the goods manufactured, whether domestic or interstate, and only the same kind of incidental and indirect effect as that which results from the payment of property taxes or any other and general contribution to the cost of government. Therefore, it does not amount to a regulation of interstate commerce. And, for like reasons, it has not the effect of imposing a tax upon the property or the business transactions of plaintiff in error outside of the State of Missouri, and hence does not deprive plaintiff in error of its property without due process of law."

Both sides seek vindication of their positions in the case of *Michigan-Wisconsin Pipe Line Co. v. Calvert,* 347 U.S. 157, 74 S.Ct. 396, 98 L. Ed. 583. Texas imposed a tax on the occupation of "gathering gas," measured by the entire volume of gas "taken." It was held an infringement of the commerce clause as applied to an interstate gas pipe line company, where the taxable incidence was the taking of gas from the outlet of an independent gasoline plant within the state for the purpose of immediate interstate transmission. That The California Company can get no solace out of the case appears from this language:

" * * * Cited to support this principle was *Oliver Iron Mining Co. v. Lord,* 262 U. S. 172 (1923), where a state tax levied on all 'engaged in the business of mining or producing iron ore or other ores' was upheld since the 'ore does not enter interstate commerce until after the mining is done, and the tax is imposed only in respect of the mining' (at 179); and *Hope Natural Gas Co. v. Hall,* supra, which upheld a tax on 'producers of natural gas reckoned according to the value of that commodity at the well.' But the tax here is not levied on the capture or production of the gas, but rather on its taking into interstate commerce *after* production, gathering and processing."

The quotation from the opinion in *Michigan-Wisconsin Pipe Line Co. v. Calvert,* supra, clearly indicates that if the excise under present attack had been placed upon Standard Oil Company, the latter could have asserted with propriety that interstate commerce was burdened. However, the implication is just as clear that the activity of The California Company does not bring the levy against it within the protection of the interstate commerce clause.

Interstate commerce is not generally burdened by a state income tax. Courts have upheld income taxes against charges that they constitute a burden on commerce. *Portland Cement Co. v. Minnesota,* supra. Since

there is reason to believe that the present tax is a net income tax in view of the decision in *Welch v. Henry,* supra, we find no burden here.

We conclude:

▬ (1) This is not a tax on interstate commerce or gross receipts derived therefrom. It is an excise upon the gross receipts derived from the extraction of certain raw materials from the bowels of the earth in Colorado.

▬ (2) It is a tax visited upon a local activity that cannot again become subject to another duplicating tax — the activity cannot be the object of multiple state taxation. Production and extraction, an integral part of the structure of the tax here created, takes place only once; hence, interstate commerce could not be involved.

▬ (3) Such production is essentially a mining operation and therefore is not a part of interstate commerce even though after processing the product is to be shipped in interstate commerce pursuant to a contract for its purchase. Such activity is a local function subject to taxation, and the matter and measure of the tax is gross receipts derived from such production.

Should the Act receive a retrospective construction? The Director of Revenue construed it as legislation working retrospectively. A portion of the total tax covers the months of January, February, through March 27, 1953, on which day the revenue measure in question was approved by the Governor. It is the contention of The California Company that the construction of the measure by the State of Colorado compelling payment for the period prior to the approval of the Act constitutes a retrospective operation in contravention of Section 11, Article II of the Colorado constitution. The California Company also contends that if the revenue measure does by word operate retrospectively, it is invalid.

Section 1 of the Act provides that the tax shall be levied, collected and paid "for each taxable year ending on and after December 31, 1953." The only other pro-

vision in the Act fixing time is that which requires every producer from and after May 1, 1953, to withhold from royalty payments a certain percentage and to make periodic reports and payments thereafter of the amounts so withheld.

It is urged by the State of Colorado that the "taxable year" refers to the "taxable year" of the general income tax law of which the present tax constitutes an amendment. Further, the State contends that the taxable year began January 1, 1953, and that retrospectivity here does not render the law vulnerable to assault on the ground that the General Assembly is forbidden to enact a law which shall be "retrospective in its operation."

It is a fundamental rule "that all statutes shall be construed prospectively unless a contrary intention is clearly manifest." *Curtis v. McCall, Judge,* 79 Colo. 122, 244 Pac. 70; *French v. Deane,* 19 Colo. 504, 36 Pac. 609, 24 L.R.A. 387.

We are not disposed to hold that there is a clear intention on the part of the legislature to make the exaction work retroactively. Indeed, a very serious question of constitutionality would arise if the revenue measure was construed to mean that it worked retrospectively. It has been said that a retrospective law "embraces a statute which abrogates an existing right of action or defense, or creates a new obligation on transactions or considerations already past." *Evans v. Denver,* 26 Colo. 193, 57 Pac. 696.

Finally, in respect to the order entered by the trial court for an accounting, it appears that the determination of the amount of the tax, payment under protest, the accuracy of the amount of the tax, whether there was error in any computations, are administrative problems. C.R.S. '53, 138-1-35, creates administrative machinery for determining tax liability, and this was followed in this case, at the conclusion of which the tax liability determined thereby was paid under protest. Apparently the decision of the Director of Revenue is

final against the State, for 138-1-36 makes available only the remedy to be pursued in the event the taxpayer is dissatisfied with the Director's decision.

In view of what has been said, the judgment must be and is affirmed in all respect except as to the retrospective application of the law and the direction for an accounting. The starting date of the tax is March 27, 1953, and the judgment of the trial court should be amended to so show. Since the direction for an accounting is improper, the order therefore should be stricken from the trial court's order.

MR. JUSTICE MOORE concurs in the result.

MR. JUSTICE HALL dissents.

MR. JUSTICE HALL dissenting:

I respectfully dissent from the majority opinion.

The tax under attack, though labelled as a tax on "gross income," is in my opinion a tax on property, an ad valorem tax, not an income tax. The majority opinion holds to the contrary and concedes that if it were an ad valorem tax it would be unconstitutional.

Oil and gas, coal, gold, silver and other metals are all a part of the realty, placed there by nature, and once severed are not replenished by nature. To call the proceeds derived from the severance and disposition of such realty (realty which is gone forever) income, and subject to tax as income, is at variance with the common meaning of that word.

On removal and sale of a barrel of oil from land the land owner has more money, but less oil. Similarly, when a ton of coal is severed from the realty and brought to the surface, the land owner has the same amount of coal as before the severance, though it has been converted into personalty and its value enhanced by reason of its extraction and being made available and suitable for consumption. Such efforts may result in profits or

losses, but I am unable to see by what process of reasoning gross proceeds from the sale of the finished product can be considered as income.

In my opinion the legislature, in allowing as a credit against the amount of gross income tax due " * * * the sum of all *ad valorem taxes* levied, assessed and paid during the taxable year upon crude oil, natural gas, oil and gas leaseholds and leasehold interests, and oil and gas royalties and royalty interests for *state, county, municipal, school district* and special district purposes * * *," necessarily recognizes the tax as an ad valorem tax. There is no way of determining the amount of tax remaining due and collectible without knowing the amount of the ad valorem taxes assessed and paid. The two different taxes, if they are different, are inextricably interwoven, and, as I view it, are simply two ad valorem taxes against the same property in contravention of both state and federal constitutional inhibitions.

Along the same line of reasoning, I am of the opinion that this tax deprives the owners of gas and oil lands of the equal protection provisions of the Federal Constitution. To illustrate, let us take "A," an owner of lands proven to contain valuable deposits of oil and gas; "B," an owner of lands proven to contain valuable deposits of coal, and "C," an owner of lands proven to contain valuable deposits of "gold, silver, lead, copper, or other precious or valuable minerals." Each property is subject to ad valorem taxes imposed by the county in which the property is located. These taxes are all based on assessments on the full cash value of the properties and they are equal and uniform. Assuming that "A" owns forty acres of oil land; "B" forty acres of coal land, and "C" forty acres of gold land, and that during a period of, say, ten years each forty acres is depleted of its minerals. Each must pay the ad valorem taxes assessed annually on the full cash value of the lands. If 10% of the minerals are extracted each year, then the assessed valuation should be reduced 10% each year.

At the end of the ten-year period there would be no more ad valorem taxes based on mineral valuation. "A" would have paid the same ad valorem tax as "B" and "C," and in addition, being the owner of oil lands, would have paid a graduated percentage of gross revenues derived from the sale of the realty. "B" and "C" would pay only the ad valorem tax. Such methods of taxation do not afford "A," "B" and "C" equal protection. To single out owners of oil while exempting owners of coal and gold and silver, all of whom occupy identical positions, cannot be called equal or uniform. Rather, the treatment given "A" is arbitrary, capricious and very unequal indeed. Understandably, the legislature, in quest of urgently needed revenue, chose the oil industry, beneficiaries of a depletion allowance, supposedly rolling in wealth, rather than the depressed and nonprofitable coal and metal mining industries, as the most likely and easily tapped source of revenue. Such selectivity *does not,* possibly I should say *should not, find sanction in our system of government.*

Our system of government does not sanction nor permit special laws, but rather calls for general laws that affect all, or at least some reasonably selected segment, of the people alike.

Here the tax is imposed only upon the production of oil and gas. Those producing coal, gold, silver and other natural resources, nonreplenishing, are in identically the same position as those producing oil and gas, but their tax treatment as provided by the statute in question is so different, and the purported classification so nebulous, that one must conclude that the plaintiff is not afforded equal protection of the laws of the state of Colorado, as is guaranteed by the Fourteenth Amendment to the Constitution of the United States of America.

The judgment should be reversed.